GRISBAUM, Judge.
This appeal concerns a products liability matter arising out of an industrial accident at Celotex’s Marrero plant in which the plaintiff, Mr. Godfrey Cosse (Celotex employee), sustained serious injuries. We reverse.
The pivotal issue presented is whether the trial court committed reversible error in finding the plaintiff (employee) five percent at fault.
FACTS
Mr. Godfrey Cosse worked at the Celotex Plant in Marrero, Louisiana. The accident in question occurred on June 7, 1984. At the time of the accident, Mr. Cosse had worked for Celotex for approximately one year and had worked in the finishing No. 5 building, where the conveyor was located and the accident occurred, for about six months.
There, the Celotex Corporation Marrero facility was engaged in the production of numerous products made from bagasse, a by-product of sugar cane. One of those products was insulation boards.... The insulation board production facility consisted of various conveyor machines which allowed for the movement of the bagasse. The production of insulation boards began with raw bagasse which was unloaded from trucks onto a convey- or belt.... The bagasse was then transported to a hydro-pump. From the hydro-pump it was transferred to a digester where it would be cooked for forty-five minutes to an hour.... It was then dumped into blow pits. The product would then be pumped from the blow pits to a shredder and then pumped to the Clifton Refiners to be put in the Clifton pits.... Board machines would then take the bagasse to the driers at which point it would be dried into a slab. It was then conveyed to the finishing room where it was cut into boards.... The number five finishing room, where Mr. Cosse’s injury occurred, housed two conveyors, a north-south and east-west conveyor_ The north-south conveyor transported the slabs to two saws, an edge cut saw and an edge trim saw. The scraps cut from the boards would fall into the east-west conveyor (scrap conveyor) which conveyed the scrap to a device called a hog. The hog would then grind the edges and trim into raw ba-gasse to be sent back into the production line to be used to make additional boards_ The scrap conveyor was lo *110 cated under the floor of the Celotex facility.... The scrap conveyor consisted of a frame which had a tail end and a head end. The frame was made of two chains connected by wooden slats (flights). The head shaft or end, the source of the conveyor’s power, was located near the hog. The tail or return end was located east of the hog.... The wooden slats dragged the scrap over a quarter inch plate which had flared up sides to prevent the scraps from escaping below the conveyor.... The tail end consisted of two sprockets connected by a metal shaft which allowed the wooden slats to move in a continuous motion.... The tail or return end was covered by a metal plate which could be opened for access to the return end.... The return end of the conveyor included an area four feet by four feet which was designed for cleaning and maintenance access. The work area in the return end was four feet by two feet.... The conveyors in finishing building number five were controlled by two switches, a main switch located near the hog on the west wall, and a relay switch located on the Marine Johnson saws.
We adopt the description of the conveyor system as stated in plaintiff-appellee’s original brief at pp. 2-3.
In 1946, Rust Engineering Corporation (now Rust International Corporation, referred to as Rust) entered into a contract with Celotex for the design and construction of an addition to the Celotex Marrero facility, including the design of the convey- or system for the movement of scrap. Rust contracted with Link Belt Corporation (predecessor to FMC Corporation, referred to as Link Belt) regarding the scrap conveyor. Link Belt sold to Rust the component parts of a conveyor, which they manufactured according to specifications furnished by Rust.
Mr. Cosse was a jack operator. In addition, he was required to clean the return end of the scrap conveyor when it was “down” (not running). Whenever the conveyor was “down,” it was the job of several employees to remove the scrap that had accumulated at the end of the conveyor in the trench. At the time of the accident, Mr. Cosse was performing routine maintenance on the scrap conveyor. To remove the scrap, he removed the metal grate that covered the access hole into the trench where the scrap had accumulated. Mr. Cosse then stepped down into the trench, straddling the conveyor and placing his foot on one of the wooden flights. While he was performing the scrap removal, apparently an unknown employee turned the conveyor on from the wall switch located outside the trench about 80 feet away. Mr. Cosse’s ankle was crushed between the flights of the running conveyor. He sustained a compound fracture of the ankle. Mr. Cosse underwent surgery to repair the fracture, requiring a plate and screws in the bone. His convalescence was long. He was 47 years of age at the time of the accident.
Plaintiff asserted at trial that the conveyor was defective and unreasonably dangerous because it was designed without safety devices, and alternatively, Link Belt and/or Rust failed to warn of the dangers inherent in the conveyor.
The safety devices alleged to be required to make the conveyor safe are two: first, a type of guard placed at the shaft of the return end of the conveyor, to prevent an employee’s exposure to the moving parts of the conveyor, and second, an “interlock” switch in the trench. The function of the interlock switch is to prevent anyone from activating the conveyor from a remote point once the person in the trench has turned the switch off, deactivating the conveyor. Such a switch was not included by Link Belt or Rust but was installed later by Celotex prior to this accident.
The trial proceeded against Link Belt and Rust. Thereafter, the jury rendered a verdict on May 17, 1991 and judgment was rendered by the trial court in accordance with that verdict on September 5, 1990.
The jury returned a verdict apportioning fault in the following manner:
Rust 50 percent
Link Belt 30 percent
Cosse 5 percent
Celotex 15 percent
*111 ANALYSIS
Initially, we note the record shows several co-workers of Mr. Cosse’s and other Cel-otex employees testified as follows:
TROXLER
Mr. Roland Troxler testified regarding safety rules and safety meetings at Celo-tex. He began working at Celotex in 1946 as a laborer, ending up as an electrician. His job required him to change the electrical wires in the trench at the end of the conveyor. Mr. Troxler recalled that safety rules were written on a chart posted on the bulletin boards, but he was never instructed specifically about how to clean the trench. He was also never instructed on the purpose of a lockout switch in the trench — he learned of its purpose by “word of mouth”. Whenever he worked in the trench, he pulled out the fuses of the main switch because he was afraid that the conveyor would be turned on while he was in the trench. Mr. Troxler did not perceive the switch in the trench to be a safety switch.
THIBODEAUX
Mr. Gerald Thibodeaux began working at Celotex in 1945 as a sample cutter. When he was hired, he did not receive any safety instructions about the machine. At the time of Mr. Cosse’s accident, Mr. Thibo-deaux was a foreman directing a crew, including Cosse, who worked around the scrap conveyor. Mr. Cosse’s duties included clean-up work, including going into the conveyor trench to clean up the scrap. Mr. Thibodeaux testified that Cosse’s duties were written in his job description and given to him verbally. Mr. Thibodeaux knew that the switch in the trench was an interlock safety switch, but he doesn’t remember who told him about that. There were no warning signs or instructions near the switch telling anyone how to operate it. Mr. Thibodeaux explained the procedure of getting down into the trench for cleaning and also claimed that he instructed everyone who went down there on how to do it. Even if the conveyor had already been turned off at the other switch, he would still turn this one off, too). He explained how the switch was operated. Mr. Thibo-deaux also stated that Mr. Cosse was a good worker and a cooperative employee.
On cross-examination, Mr. Thibodeaux admits he does not specifically remember instructing Mr. Cosse personally on the cleaning procedures of the trench, or if he personally told Cosse about the switch position and which switch position meant off. Another worker, Mr. James Frazier, was the “regular clean up man” whose specific job it was to clean the scrap conveyor. Mr. Thibodeaux testified about safety meetings Celotex sponsored. The meeting occurred about once a month and seemed to consist of one-on-one admonishments to employees to be careful around the conveyor; not every crew member was personally told. Also, he related that the switch had been moved several inches because the location of the switch caused it to be “knocked” off several times by someone using a pitch fork while cleaning inside the trench.
Significantly, Mr. Thibodeaux asserted that there was enough room to work in the trench and that it was not necessary for a worker to place his foot between the shaft connecting the two shafts and the place where the flights went, as Mr. Cosse placed his foot. Furthermore, Mr. Frazier had instructed other employees on this matter. It was obvious to Mr. Thibodeaux that it was dangerous for a worker to place his foot on the conveyor while cleaning it, because someone could start the conveyor.
BELTON
Mr. Shelton Belton began work as a laborer at Celotex around 1982. He testified that when he started at Celotex, company rules and regulations were explained to him and were posted on the wall. He was not given any instructions or written booklets regarding safety. Later he became a stack operator and worked in the finishing No. 5 building, the same building in which Mr. Cosse worked and was injured. It was not part of his job to clean the trench, but he was instructed by the foreman on how to enter the trench and how to cut off the conveyor by the trench interlock switch. Mr. Belton remembered that electrical *112 problems sometimes caused the conveyor to come on by itself even if it were switched off. He was present when the accident occurred, but he could not say for sure how the machine came on when Mr. Cosse was in the trench. He testified that Cosse was a good, cooperative employee who did his work. An employee who was bending down in the trench could not be easily seen by those outside the trench.
On cross-examination, Mr. Belton testified that he knew the purpose of the trench switch prior to Mr. Cosse’s accident and that he had been apprised of this purpose by Mr. Frazier and other crew leaders. He also admitted that Mr. Cosse and Mr. Frazier were friends and talked often. DiMARCO
Mr. Anthony DiMarco, a maintenance man, began working at Celotex in 1941 as a laborer. He did not personally know Mr. Cosse. He testified that written safety regulations were given to maintenance men but not to laborers. As maintenance man, he attended a safety meeting about once a month and stated that the lockout switch had been addressed. He had worked around that conveyor before Mr. Cosse’s accident and knew of the purpose of the switch located in the trench, but he always put his lock on the main switch to “take no chances.” He did not have faith in the efficacy of the switch located in the trench. Mr. DiMarco testified that no one worked on or repaired the switches in the trench on the night of the accident.
WEBER
Mr. Henry Weber began working at Cel-otex in 1945 and had retired in 1989. He did not work in finishing No. 5 until 1984; however, he worked with a similar scrap conveyor in finishing building No. 2, which he was required to clean on occasion. Nobody instructed him on safety rules concerning the conveyor.
When he was a production foreman in finishing No. 5, he instructed his crew on how to clean the trench. He knew about the function of the switch in the trench and its relation to the wall switches and instructed his crew members on how to operate this switch. However, Mr. Weber did not instruct Mr. Cosse on how to operate this switch.
About an hour after the accident occurred, Mr. Weber returned to the trench and observed that the trench switch was in the “on” position. He tested the switch by turning it to “off” and then attempting to start the conveyor from the remote switch on the wall. He was unsuccessful in starting the conveyor. When asked if Mr. Cosse was a good employee, Mr. Weber affirmed that Cosse was a very good and cooperative employee. He then stated that there were no warning signs in the trench located near the switch.
On cross-examination, Mr. Weber stated that it was possible to clean the trench without putting one’s foot where Mr. Cosse’s foot was caught, and that he had instructed his crewmen never to stand on the conveyor while cleaning it. He also instructed his crewmen to always flip the trench switch to off because he knew the switch could not be overridden by the other switches outside the trench. Mr. Weber testified that the switch was working correctly on the night of the accident. FRAZIER
Mr. James Frazier had been working at Celotex for 44 years and had been instructed on the safe cleaning of the conveyor. His specific duties included cleaning the scrap conveyor. Before he cleaned it, he would shut it down by either the wall switch or the trench switch. He related that he would not put his feet around the conveyor while cleaning it. Mr. Frazier was the one who turned the conveyor off by the wall switch when Mr. Cosse hollered for help. Mr. Frazier testified that he and Mr. Cosse were good friends and got along well. Very significantly, Mr. Frazier testified that he personally showed Mr. Cosse how to operate the switch located in the trench. Furthermore, he testified that Mr. Cosse had held the switch for other employees. Mr. Frazier appreciated the danger of a running conveyor. There was neither a sign nor directions located near the switch in 1984. Finally, Mr. Frazier testified that the conveyor had become stuck “on” before.
*113 COSSE
Mr. Godfrey Cosse testified that he was never instructed on procedures for entering the trench and while he was aware of the presence of the interlock switch in the trench, he did not know its purpose. He also testified that he was never told it was part of his job to clean the trench, but he understood it was because he had seen other workers clean the trench. He denies that he knew the purpose of the interlock switch and also denies that he ever held the switch for Mr. Frazier, nor had he ever seen anyone use the switch.
On cross-examination, Mr. Cosse admitted that he knew the conveyor was dangerous when running. In all the times he entered the trench, he was never aware of who stopped the conveyor or how they had stopped it. He never attended a safety meeting at Celotex. No one had ever instructed him on how to clean out the trench.
ANALYSIS
Of recent vintage, the courts in Louisiana have adopted the duty-risk analysis, and, in doing so, the courts have consistently maintained that, in any tort action, the threshold question and initial inquiry is what was the cause-in-fact of the injury. See Fox v. Bd. of Supervisors of La. State University and Agric. and Mechanical College, 576 So.2d 978 (La.1991).
With that yardstick in mind, we can analytically peruse the record testimony and evidence regarding negligence in our evaluation of the cause or causes of the accident itself. It becomes readily apparent that Celotex itself was, in many respects, negligent. For instance, the testimony clearly reveals that the so-called safety rules and safety meetings, not to mention specific lack of instruction inherent therewith, were performed and/or executed in a very slipshod fashion — all to the potential and constant threat of harm to any and all of Celotex’s employees. Likewise, it can be intelligently argued and viewed that the jury obviously saw that either Rust/Link Belt were likewise negligent in not sufficiently and/or adequately placing warning signs and instructions at the pivotal areas of the conveyor. And, in order to complete the circle of negligence, we see a plaintiff-employee testifying that, while in the trench while cleaning the machine, he actually placed his foot between the shaft connecting the two shafts in the place where flights went. In laymen’s terms, he simply placed his foot in a position on the conveyor while cleaning it that, logically, if the machine were turned on, his foot clearly would be injured. In this connection, all of the testimony of the other employees and co-workers clearly agreed that, while cleaning the trench, it was unnecessary for anyone to posture themselves as Mr. Cosse did. Of equal importance, all.of the other co-workers testified that they were aware of the lockout switch/remote switch mechanism.
In the final analysis, no one could reasonably argue that Mr. Cosse was free of negligence. Therefore, in viewing the question of negligence in relation to all parties, including the plaintiff, certainly there were degrees of negligence to be shared by all. However, under our mandated duty-risk analysis, we must necessarily ask what was the cause-in-fact of the accident. The record clearly reveals that, but for Mr. Cosse’s negligence, there would have been no accident. We reach that conclusion by asking ourselves two basic questions: (1) if the so-called interlock switch had been turned off by Mr. Cosse, could the conveyor have been turned on by the unknown employee? and (2) if Mr. Cosse would have been cleaning the trench in the proper manner, could the accident have possibly happened?- The answer to both questions is an obvious “No.” Therefore, we conclude that no reasonable juror could have found that there was any other cause for this accident other than the complete negligence and lack of credible testimony on behalf of the plaintiff, Mr. Cosse. Further, we must conclude that any possible combined negligence of Celotex/Rust/Link Belt simply did not contribute to the accident.
Recognizing our jurisprudential mandate that the findings of the jury are entitled to great weight and will not be disturbed ab *114 sent manifest error, Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), we find that this jury had no reasonable factual basis for its apparent factual conclusions and, likewise, erred as a matter of law.
For the reasons assigned, the judgment of the trial court dated September 5, 1990 is hereby reversed. We render judgment for Link Belt/FMC Corporation and Rust Engineering Company and against the plaintiff, Mr. Godfrey Cosse. All costs of this appeal are to be paid by the original plaintiff, Mr. Godfrey Cosse.
REVERSED.
DUFRESNE, J., concurs with written reasons.