601 So.2d 1349 (1992)
Godfrey COSSE
v.
ALLEN-BRADLEY COMPANY, et al.
Nos. 91-C-2816, 91-C-2832.
Supreme Court of Louisiana.
May 26, 1992.
Rehearing Denied June 26, 1992.
*1350 Christopher James Bruno, Joseph Michael Bruno, Bruno & Bruno, for applicant.
Thomas Joseph Wyllie, Richard Bouligny Eason, II, Adams & Reese, John J. Weigel, Madeleine Fischer, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, John A. Bivins, Roy, Carmouche, Bivins, Judice, Henke & Breaud, Daniel Aubry Ranson, Steven Dow Oliver, Windhorst, Gaudry, Ranson, Higgins & Gremillion, for respondents.
MARCUS, Justice.
In 1984 Godfrey Cosse, an employee of Celotex Corporation (Celotex), was injured when his leg was caught in a scrap conveyor at the Celotex Marrero plant. Cosse filed suit for damages, naming as defendants Link-Belt Corporation (Link-Belt)[1] and Rust Engineering Company (Rust).[2] Cosse alleged that his injuries were caused by the defective conveyor that was manufactured by Link-Belt and designed by Rust. Defendants filed answers generally denying the allegations of the petition. Rust also filed a peremptory exception on the ground that Cosse's suit was barred by La.R.S. 9:2772. Link-Belt filed a motion for summary judgment based in part on the same ground. The trial judge denied the exception and the motion for summary judgment. Celotex, a self-insured worker's compensation carrier, intervened for reimbursement of worker's compensation benefits and/or medical expenses paid or to be paid in the future.
After a jury trial, the jury returned a verdict in favor of Cosse and awarded him $444,612.00. The jury allocated fault for Cosse's damages: Rust 50%, Link-Belt 30%, Celotex and its employees 15%, and Cosse 5%. The trial judge entered judgment finding Link-Belt and Rust liable jointly, severally, and in solido for $422,343.40 together with legal interest from date of judicial demand and costs.[3] Celotex, as intervenor, was awarded $96,474.40 plus legal interest from the date of each payment and in preference to sums due Cosse.[4] The judge ordered Celotex to deduct from its intervention award fifty-two per cent of Cosse's attorney fees and costs. Any credit due to Celotex against its liability for future worker's compensation benefits or medical expenses was ordered to be reduced by Cosse's 5% fault. Celotex, Link-Belt, and Rust appealed.
The court of appeal reversed the judgment of the district court and rendered judgment in favor of Link-Belt and Rust and against Cosse.[5] Although the court found that there were degrees of negligence to be shared by all the parties, it concluded that
no reasonable juror could have found that there was any other cause for this accident other than the complete negligence and lack of credible testimony on behalf of the plaintiff, Mr. Cosse. Further, we must conclude that any possible combined negligence of Celotex/Rust/Link Belt simply did not contribute to the accident.
On the applications of Cosse and Celotex, we granted certiorari to review the correctness of that decision.[6] The applications were consolidated for hearing before this court.
The primary issue in this case is whether the court of appeal erred in reversing the jury's findings of fault.
*1351 Under Louisiana products liability law,[7] to recover from a manufacturer or supplier, a plaintiff must prove that the injury resulted from the condition of the product, the condition made the product unreasonably dangerous to normal use, and the condition existed at the time the product left the manufacturer's or supplier's control. Halphen v. Johns-Manville Sales Corp., 484 So.2d 110, 113 (La.1986); Bell v. Jet Wheel Blast, 462 So.2d 166, 168 (La. 1985). A product may be unreasonably dangerous per se or unreasonably dangerous due to a construction defect, a defect in design, or a failure to warn adequately of a danger inherent to normal use that is not within the knowledge of or obvious to the ordinary user. See Halphen, 484 So.2d at 114-15. To recover for negligence, a plaintiff must prove that the injury or damages were caused by a breach of a duty owed by the defendant. There must be both a cause in fact and a legal cause of the damages. Sinitiere v. Lavergne, 391 So.2d 821, 825 (La.1980).
In either a negligence or products liability case, the jury may also take into account any fault of the plaintiff that may have caused the damages. See Bell, 462 So.2d at 171. However, negligence or fault on the part of the plaintiff will not necessarily defeat the claim, but can reduce the amount to be awarded.[8] In allocating fault, "the court or jury should consider the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages." Ingram v. Caterpillar Mach. Corp., 535 So.2d 723, 730 (La.1988). The factors to be considered include: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967, 974 (La.1985).
In Louisiana, the manifest error/clearly wrong standard applies to appellate review of a jury's findings of fact. In Rosell v. ESCO, 549 So.2d 840, 844 (La.1989), we stated:
[I]f the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. [citations omitted]
We must therefore determine whether the jury in this case was reasonable in finding that Link-Belt, Rust, Celotex, and Cosse were at fault in causing Cosse's injury and reasonable in apportioning fault among them.
Celotex is a producer of insulation boards made from bagasse, a by-product of sugar cane. Finishing room # 5 of the Marrero plant, in which the dried and processed slabs of bagasse were cut into boards, contained two conveyors. The north-south conveyor carried slabs to an edge-cut saw and an edge-trim saw. Any scraps cut from the slabs would fall onto an east-west scrap conveyor located beneath the finishing room floor. The scrap conveyor was built in 1947 as part of a contract between Celotex and Rust for the design and construction of additions to the *1352 Marrero facility. Rust in turn contracted with Link-Belt for the scrap conveyor. Rust assembled and installed the scrap conveyor sent by Link-Belt and was responsible for installation of the electrical power supply to the scrap conveyor. The scrap conveyor consisted of a frame made of two parallel chains connected by a series of wooden flights. The flights pushed the scraps along a metal plate to the "hog" at the head end of the conveyor, which ground the scraps for reprocessing into boards. The tail end of the conveyor, the "return," was approximately eighty feet from the hog and consisted of two sprockets connected by a shaft that allowed the wooden flights to move in a continuous motion. The opening to the return area, the "trench," was covered at floor level by a perforated metal plate that could be lifted to allow access for cleaning or maintenance. The entire trench was approximately four feet by four feet by four feet. The work area in the trench, however, was reduced due to the presence of the conveyor. Three switches controlled power to the scrap conveyora main switch on the wall by the hog that controlled electrical power to the entire building, a relay switch on the saws, and a disconnect switch in the trench. In order to do maintenance or cleaning work in the trench while the scrap conveyor was shut down, an employee could lift the metal grate, reach down and turn the trench switch off to prevent someone at another location from inadvertently turning on the conveyor. Neither Link-Belt nor Rust designed or provided the trench switch, it was installed by Celotex after completion of the plant additions.
Cosse, a lift machine operator in finishing room # 5, was required to help with clean-up whenever the production line was down. On June 7, 1984, while the finishing room machinery was down for repair and the scrap conveyor was not in operation, Cosse went down into the trench to clean out accumulated scraps. He did not turn the switch in the trench to "Off" and positioned his left foot on the conveyor. The conveyor was restarted from the wall switch, catching Cosse's leg between a wooden flight and the shaft and causing him severe injury.
The jury found that a cause of Cosse's injuries was the defective product, the scrap conveyor. Cosse offered testimony of three expert witnesses on the issue of the defects of the conveyor. An expert in the field of human factors engineering testified that the conveyor was unreasonably dangerous because it failed to include appropriate safety devices, such as an interlock device that would automatically render the conveyor inoperative whenever the metal grate was lifted. He believed that the existing trench switch was not adequate because there was no reminder to turn it off and no indication of its purpose. A mechanical engineering expert testified that the conveyor was defective because the trench switch was not an adequate response to the hazard of the machine inadvertently being restarted from another location while someone was working in the trench. He stated that the switch was easily overlooked and had to be operated manually, rather than automatically. A third plaintiff expert testified that the conveyor was defective for three reasonsthe trench was too small, a worker in the trench could not be seen from the master switch, and the trench switch was too confusing. Several Celotex employees testified that they were confused as to the purpose of the switch and how to operate it. Link-Belt offered testimony of only one expert on the issue of the defectiveness of the conveyor. In the course of testifying, that expert stated that interlock devices were available in the 1940's and if none were provided on a conveyor, good practice would have included a warning on the machine. There was no dispute at trial as to the existence of warnings on the switch or in the trench. Celotex employees testified that there never had been any warnings near the trench.
Link-Belt and Rust dispute their responsibility for the design and manufacture of the conveyor. Since the conveyor was built in the 1940's, very little documentary evidence remains regarding the responsibilities of the parties under the contract. Link-Belt argued that it was not a manufacturer *1353 because it had furnished only component parts for assembly and installation according to Rust's specifications. However, several witnesses stated that in their opinion Link-Belt was the designer of the conveyor system. One of the exhibits introduced into evidence was a Link-Belt drawing indicating how the parts it manufactured fit together. Furthermore, a former Link-Belt employee testified that in the 1940's Link-Belt had the capacity to design interlock devices for conveyors and had installed warnings on other conveyors.
Testimony indicated that Rust also played a part in the design of the conveyor and its failure to provide warnings. Rust provided specifications to Link-Belt concerning such criteria as the location, capacity, and purpose of the conveyor. There was conflicting testimony as to whether Rust or Link-Belt designed the trench. Although Rust assembled, installed, and provided power to the conveyor, it also failed to provide an adequate safety device to guard against the danger Cosse encountered and failed to provide warnings.
Several Celotex employees testified that, in addition to the absence of any warnings in the trench, Celotex had not given them written safety instructions for cleaning or operating the conveyor. They also testified as to their confusion about the meaning of the positions on the trench switch. Employees testified that although they knew that the switch was a safety switch, they did not depend on it to prevent the conveyor from being started from another location. A Celotex electrician testified that he did not trust the switch and would not do maintenance work in the trench until after he had pulled the fuses out of the main switch at the other end of the conveyor. Cosse testified that he did not believe that the machine was dangerous when the system was shut down, had no knowledge of the purpose of the switch, and had received no instructions regarding cleaning the trench. He also testified that he had only been in the trench five times prior to the accident. On the other hand, a co-worker testified that Cosse knew how to clean the trench and operate the switch, and had held the switch for him on occasion. A Celotex production foreman testified that the switch was working properly when he tested it shortly after the accident.
On review of the record, we cannot say the jury was clearly wrong in finding that the scrap conveyor was defective due to the lack of an adequate safety device to prevent this type of accident and due to the absence of warnings of the danger inherent in the machine's operation. The weight of the testimony indicates that an automatic interlock on the conveyor would have prevented injury to someone working in the trench if the conveyor were accidently started from another location. In the absence of an automatic interlock, warnings should have been placed in the trench. It was reasonable to find that Link-Belt was responsible in part because it designed a conveyor without any safety device or warnings to prevent this type of injury. Since Rust was in charge of the additions to the building, provided the specifications for the conveyor to Link-Belt, and assembled and installed the conveyor without an adequate safety device or warnings, Rust must share responsibility for the accident. Celotex installed a disconnect switch in the trench in apparent recognition that the machinery in the trench posed a potential hazard to employees. However, it must bear part of the blame for not sufficiently instructing or warning its employees. It is also reasonable to conclude that Cosse's conduct was a factor in causing his injuries. Therefore, the jury was not clearly wrong in finding that the conduct of Rust, Link-Belt, Celotex, and Cosse caused Cosse's injuries. In addition, applying the Watson factors to this case, we find that the jury was not clearly wrong in its allocation of fault. The court of appeal erred in holding otherwise.
Rust and Link-Belt further contend that Cosse's claims against them should be dismissed in accordance with La.R.S. 9:2772, which at the time of the accident provided in part:[9]

*1354 A. No action, whether ex contractu, ex delicto, or otherwise, to recover on a contract or to recover damages shall be brought against ... any person performing or furnishing the design, planning, supervision, inspection, or observation of construction or the construction of an improvement to immovable property:
(1) More than ten years after the date of registry in the mortgage office of acceptance of the work by owner; or
(2) If no such acceptance is recorded within six months from the date the owner has occupied or taken possession of the improvement, in whole or in part, more than ten years after the improvement has been thus occupied by the owner....
The evidence was sparse on this issue. Link-Belt designed the scrap conveyor and delivered the unassembled parts to Rust, which was responsible for its assembly and installation. The conveyor apparently was suspended from the floor of the building and attached with bolts. The conveyor is no longer in use. Trial testimony seems to indicate that in order to remove the conveyor, it would be necessary to disassemble it and take it out in pieces. Based on this evidence, we can not say that defendants sufficiently proved that the conveyor was an improvement to an immovable. Therefore, La.R.S. 9:2772 is not applicable to this case.[10]
In its application to this court, Celotex contends that the intervention award was improperly reduced by plaintiff's fault, a specific dollar amount should not have been designated, interest should have been awarded from date of judicial demand, and Celotex's share of Cosse's attorney fees and costs should have been limited to onethird of its total recovery. Since the court of appeal found in favor of Link-Belt and Rust, it did not reach these issues. We consider it more appropriate to remand the case to the court of appeal to review these issues as well as other issues not reached by it or addressed by this court and to enter a proper judgment.

DECREE
For the reasons assigned, the judgment of the court of appeal is reversed. The apportionment of fault found by the jury is reinstated. The case is remanded to the court of appeal to review the issues not reached by it or addressed by this court and to enter a proper judgment.
DENNIS, J., concurs with reasons.
LEMMON, J., concurs and assigns reasons.
DENNIS, Justice, assigning additional reasons.
I join in the majority opinion with a small caveat. In Bell v. Jet Wheel Blast, 462 So.2d 166 (La.1985), we held that in some products liability cases comparative fault principles should not be invoked to reduce a plaintiff's recovery; and this court established guidelines for determining when comparative fault should not be applied. In the present case, the majority properly by-passed those guidelines because the plaintiff has not argued that comparative fault reduction of recovery is not called for in this case.
LEMMON, Justice, concurring.
On remand I would instruct the court to reduce the employer's intervention recovery in proportion its fault under the formula outlined in my dissent in Guidry v. Frank Guidry Oil Co., 579 So.2d 947 (La. 1991).
NOTES
[1] Link-Belt is now FMC Corporation.
[2] Cosse also sued Allen-Bradley Company and Square D Company as manufacturers of switches used in the conveyor. These defendants entered into settlement agreements with Cosse before trial and were dismissed from the case. Their liability and settlement agreements are not at issue.
[3] The judge reallocated fault as Rust 62.5% and Link-Belt 37.5% because Celotex and its employees are immune under the Louisiana Worker's Compensation Law. The original jury award to Cosse was reduced by his 5% fault. Apparently there was a miscalculation of the award because a 5% reduction of $444,612.00 equals $422,381.40.
[4] This sum represents the amount of past paid worker's compensation benefits and medical expenses reduced by Cosse's 5% fault.
[5] 590 So.2d 108 (La.App. 5th Cir.1991).
[6] 592 So.2d 402 (La.1992).
[7] The Louisiana Products Liability Act, La.R.S. 9:2800.51-.59, became effective September 1, 1988 and is not retroactive. Gilboy v. The Am. Tobacco Co., 582 So.2d 1263, 1264 (La.1991). Therefore, the act does not apply to the present case in which the accident occurred in 1984.
[8] La.Civ.Code art. 2323 provides:

When contributory negligence is applicable to a claim for damages, its effect shall be as follows: If a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages shall not thereby be defeated, but the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.
[9] La.R.S. 9:2772 has since been amended by 1985 Acts 303 and 1990 Acts 712.
[10] Link-Belt also argues that jury charges nos. 13, 15, 17, 22, and 23 are incorrect statements of products liability law and that the trial judge erred in failing to give the jury two of Link-Belt's requested charges. Rust contends that the trial judge erred in failing to instruct the jury regarding La.R.S. 9:2772 and the definition of a "product." We find no merit to these contentions. The instructions to the jury were correct and the requested charges were either included in the general charge or not applicable.