MAX N. TOBIAS, JR., Judge.
| ;This case began as a putative class action representing an alleged class of Louisiana homeowners’ insurance policyholders in the parishes of Jefferson, Orleans, Plaquemines, St. Bernard, St. Tammany, Terrebonne, and Washington, regarding the scope of the Valued Policy Law, La. R.S. 22:1318, in connection with damages caused by Hurricane Katrina in August 2005. By the time the trial court denied class certification, only AN-PAC Louisiana Insurance Co. (“AN-PAC”) remained as a defendant, while the plaintiff/appellant herein, Dianne Landry (formerly Orgeron), remained the sole plaintiff.[1]
Once the denial of class certification was final, Ms. Landry proceeded with her individual claim. Following a bench trial, the court dismissed her suit, from which she filed this timely appeal. After reviewing the record and the applicable law, we affirm the judgment of the court below.
In July 2001, Ms. Landry and her family moved into a one-story brick house at 7925 Dalton Street, Metairie, Louisiana. Part of the house was an addition built 12by the prior owners. According to Ms. Landry, the house had no structural defects when it was purchased by her and her then-husband. On 29 August 2005, Hurricane Katrina made landfall in southeast Louisiana, causing extensive property damage in the greater New Orleans area. Ms. Landry evacuated to Texas and returned to her Metairie home about 2-1/2 weeks later. The first thing she saw was a tree leaning against the roof of her house. She entered the home and found that the house was soaked with water and cracked. She testified that there were water stains on the ceiling. She estimated that her home had received about four feet of water. None of the documented cracks in the home were seen by Ms. Landry before the storm. All agree that the house was uninhabitable following the storm.
The ANPAC homeowners policy provided dwelling coverage of $155,000; $15,520 for “other structures” coverage; $116,400 for personal property/contents; and $38,800 for loss of use/additional living expenses.
ANPAC first inspected the damaged property within a month after the storm. Michael Petty, an independent claims adjuster, inspected the property and testified at trial. He issued a report on 13 October 2005, and took numerous pictures that were admitted into evidence. ANPAC and its counsel made numerous requests to reinspect the property, but the residence was demolished in August 2006 before a re-inspection could take place and without notice to ANPAC.
*1190 Mr. Petty stated that he observed a large tree on the property had fallen and was leaning on the tool shed and suspended over the house by its roots, which were still halfway in the ground. Most of the damage was caused to .the roof of the shed |3in the backyard. Branches landing on the roof resulted in superficial damage to the shingles within a 400 square-foot area. He also found that the wind had taken off about a six-foot span of shingles near the top of the angled roof. Another tree had fallen and damaged the chain link fence. He also inspected the inside of the house, finding a small water stain on the master bedroom ceiling.
Mr. Petty testified that he afforded Ms. Landry the opportunity to make or describe any claims for contents. He also relied on her to point out any additional wind damage he may have missed. Ms. Landry showed him numerous cracks in interior walls and the brick exterior of the house; in his opinion, he saw nothing wind-related with regard to these cracks. He measured the inside water line at 15 inches on a paneled wall surface.
Mr. Petty determined that the total amount of damage for cash value under the policy was $9,036.20. After subtracting the hurricane deductible of $7,760.00, the net paid to Ms. Landry was $1,726.20. Ms. Landry disagreed with Mr. Petty’s appraisal and, on 20 March 2006, requested a second appraisal. Another appraiser was never sent by ANPAC.
After ANPAC failed to respond, Ms. Landry hired Jim Conn of Coastal Construction Services to perform another inspection of the house. At trial, the plaintiff introduced his testimony from the class certification hearing at which the court accepted Mr. Conn as an expert in construction and insurance restoration. He admitted he was not an engineer and was not qualified to determine the amount of damages to Ms. Landry’s house due to any structural problems.
|4Mr. Conn inspected the property on 14 April 2006. He found that there was substantial wind damage to the house resulting in failure of the roofing system. His report, which addressed wind damage only, found that Ms. Landry had a net claim of $53,781.63. While he acknowledged seeing signs of structural damage, he was not qualified to render an opinion on whether the wind during Hurricane Katrina was sufficient to shift a house on its foundation.
Ms. Landry also entered into evidence the testimony of structural engineer, Donald Barnes, from the class certification hearing. Mr. Barnes stated that he was asked to determine whether the Dalton Street house was damaged by the hurricane, the severity of the damage, and if the house was inhabitable. He found the house had sustained significant wind-related damage from the hurricane. There was a separation of several inches in the brick veneer on the back of the house, the windows did not work, and there was a large tree lying on the east side of the roof. He also found significant flood damage in the house; walls were bowed, and he noted severe damage in the attic. In his opinion, the house was uninhabitable in its then-present condition, although he was not qualified to assign a dollar amount to the needed repairs. Under cross examination, Mr. Barnes admitted that the structural damage was in the vicinity of the addition to the house built before it was purchased by the Orgerons.
Ms. Landry testified that she received a letter from the Jefferson Parish Inspection and Code Enforcement Authority (“the Authority”) dated 1 June 2006 signed by Louis Savoye, the Authority’s director. His testimony from the class |ficertification hearing was admitted into evidence. By *? the letter, Ms. Landry was notified that her house was unsafe and should be demolished. Mr. Savoye stated that an independent engineering firm had inspected the house and found that the Dalton Street house was a “dangerous building” under the Jefferson Code and the engineers recommended that it be “abated by demolition.” Finally, the letter advised Ms. Landry that the house could be demolished with the assistance of FEMA and the Army Corp of Engineers.[2] The letter did not, however, give any opinion regarding the cause of the damage, whether by flood or by wind.
The house was demolished in August 2006.[3]
To support her argument that her house was rendered a total loss by the winds of Hurricane Katrina, Ms. Landry introduced the testimony given by Barry Keim, Ph.D., at the class certification hearing. Dr. Keim served as the official climatologist for the State of Louisiana and was accepted by the court as an expert in the field of climatology. He testified that the weather conditions during the hurricane varied among the parishes in the New Orleans area. At the New Orleans International Airport (which, like the Dalton Street property, is on the east bank of Jefferson Parish), the maximum sustained winds were 61 miles per hour (“m.p.h.”), with peak gusts at 74 m.p.h. He stated that the overall maximum sustained winds over the life of the storm were close to 115 m.p.h., most likely near the mouth of the Mississippi River. The highest recorded wind gusts in the | (¡metropolitan area were 120-123 m.p.h. in Eastern New Orleans; these wind gusts persisted for brief moments. Dr. Keim further testified that no tornados were recorded by the National Weather Service in southeastern Louisiana.
The defense’s expert witness, William Janowsky, a registered professional engineer, was accepted by the court as an expert in forensic and structural engineering. Mr. Janowsky was hired after the Dalton Street house was razed and, thus, based his facts and opinions, in part, on the photographs of the residence. He understood that there were claims that the house had received structural damage due to wind during the hurricane.
The trial court summarized Mr. Janow-sky’s testimony in its reasons for judgment:
Mr. Janowsky testified that based on the photographs, he determined there was limited structural damage due to wind. He explained that structural features of a building are those that hold it up or support it, whereas non-structural features are aesthetic in nature. Mr. Janowsky concluded that the cracks in the house’s brick veneer and concrete floor were consistent with foundation movement, and could not have been caused by wind. He explained that the effects of wind are greatest higher in the atmosphere. Accordingly, wind will cause more damage to the roof than to the lower portions of a building. The photographs showed that there was minimal damage to the roof coverings of the Dalton Street house. Based on the photographs, it appeared to Mr. Janowsky that the toppled tree did not come in contact with the roof; that it was suspended by its roots. The greatest damage was to the lower parts of the house. Mr. Janowsky opined that the damage to the brick veneer and the foundation *1192 was not consistent with wind damage. He testified that in the course of his career he has been asked to determine structural damage to buildings in about 5,000 cases. He has never come across an instance where wind was strong enough to knock a house off of its foundation, but left minimal 17damage to the roof. An exception to this would be where a house is built on piers.
Mr. Janowsky testified that he examined the soil at the site of the Dalton Street house. He found that the house was located in an area that was originally a swamp, there was a high instance of subsidence there. In fact, Mr. Janowsky found that some of the houses still standing near the former site of plaintiffs house showed signs of subsidence. He determined that during the life of a structure in that neighborhood, there can be as much as four feet of subsidence. In Mr. Janowsky’s opinion, this was a “textbook case” óf soil subsidence. Mr. Janowsky believed that, aside from the flood waters inside the house, there was no damage that would have made plaintiffs house uninhabitable. Due to soil conditions,
The trial court found that ANPAC had met its burden of proving the damage for which Ms. Landry sought to recover fell under the policy exclusions for water damage and/or settling of the foundation. The trial court was particularly persuaded by Mr. Janowsky’s testimony that the structural damage was due to soil subsidence and not the wind, in light of the fact that the house was built on a drained swamp. The court also noted that the structural problems occurred in the addition that the previous owner had built onto the original structure.
The court was persuaded that the four feet of water that entered Ms. Landry’s house was not wind-blown, but was flood water. As such, all damage was covered by flood insurance, not the homeowner’s policy. Consequently, the trial court ruled in favor of ANPAC and against Ms. Landry.
Ms. Landry has set forth three assignments of error for our review. The first assigned error is that the trial court was manifestly erroneous in relying on Mr. Ja-nowsky’s testimony while ignoring the testimony of Messrs. Barnes and Savoye, Because we find that the trial court was not manifestly erroneous, we discuss only the first assignment; the remaining two are moot.[4] Rand Ms. Landry.
In civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly erroneous standard, which precludes the setting aside of a district court’s finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Cenac v. Public Access Water Rights Ass’n, 02-2660, p. 9 (La.6/27/03), 851 So.2d 1006, 1023, citing Rosell v. ESCO, 549 So.2d 840 (La.1989). Thus, a reviewing court may not find reversible error if it merely decides that it would have found the facts of the case differently. Id. The reviewing court should affirm the district court where the district court’s judgment is not “manifestly erroneous” or “clearly wrong.” Id. at 9-10, 851 So.2d at 1023.
Louisiana law adopts- a two-part test for the reversal of the factfinder’s determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the *1193 record establishes that the finding is clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). “The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong but whether the factfinder’s conclusion was a reasonable one.” Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact-finder’s, reasonable evaluations of credibility and reasonable | conferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell, 549 So.2d at 844.
We find that the trial court was well within its discretion to rely on the opinion of Mr. Janowsky rather than that of the experts presented by Ms. Landry.[5] While Ms. Landry points out that Mr. Janowsky never saw the actual house, we note that he reviewed numerous photographs and personally examined the lot and surrounding neighborhood to come to his conclusion that the structural damage was caused by soil subsidence and not wind. We find that the trial court considered all the testimony presented as evidenced by it’s lengthy and thoughtful reasons for judgment. Therefore, under our standard of review, because there is evidence in the record that supports the trial court’s findings of fact, they will not be disturbed on appeal.
Because we find that Ms. Landry’s first assignment of error has no merit, we pre-termit discussion of her remaining two assigned errors.

AFFIRMED.

. At the time of Hurricane Katrina, Ms. Landry was married to Raphael Orgeron, who was also a plaintiff in this lawsuit. Later the couple divorced and Ms. Landry returned to her maiden name. Because Mr. Orgeron was not present at the trial, the court dismissed him from the suit.

. "FEMA” stands for the Federal Emergency Management Agency.

. The trial court states in its reasons for judgment that the house was demolished in August 2012, obviously a typographical error.

. Ms. Landry also alleges that the trial court erred in dismissing Raphael Orgeron as a plaintiff and by failing to address her claims under Louisiana Valued Policy Law, La. R.S. 22:1318.

. Mr. Janowsky testified in person, while Ms. Landry relied on transcribed testimony from the class certification hearing in 2007, over which the present judge did not preside.