WALTZER, Judge.
This appeal is from a June 13, 1991 judgment of the Civil District Court for the Parish of Orleans, the honorable Richard J. Ganucheau, Judge, presiding. The trial court awarded plaintiff $520,882.43 consisting of $50,882.43 past medical expenses, $20,000.00 future medical expenses, $200,-000.00 lost earning capacity and $250,-000.00 general damages. The judgment also found Louis Stubbs 100% at fault, found plaintiff free from fault, awarded expert fees, granted an intervention for amounts paid the plaintiffs hospitalization insurer and noted policy limits. From that judgment, defendants appeal[1].
*902 The judgment awarded damages for injuries sustained by plaintiff Shirley Goldman on July 12, 1984 when her stopped vehicle was rear-ended by an 18 wheel tractor-trailer cab owned by his employer and driven by Louis Stubbs, an employee of Gervin A. Mullin d/b/a “Moon Enterprises, Inc.” The 18 wheeler cab topped the crest of a raised portion of the Pontchartrain Expressway. On the other side of the crest, however, traffic was stopped due to a prior accident. Mr, Stubbs was unable to stop the 18 wheeler cab and rear-ended the plaintiffs vehicle, spinning it 180 degrees and totaling plaintiff’s vehicle.
The trial judge provided the following written reasons for judgment:
“Plaintiff, Shirley T. Goldman, was injured on July 12, 1984 when her vehicle was rear-ended by a large truck owned by defendant, Gervin A. Mullen and driven by Mullen’s employee, Louis Stubbs.
This Court is of the opinion that the accident and injuries to Mrs. Goldman on July 12, 1984 was caused solely by the fault of Louis Stubbs.

INJURIES:

Shirley Goldman sought treatment at the emergency room of East Jefferson General Hospital on the day of the accident. She was referred to Dr. Russell Levy, an orthopedic surgeon, who treated her from July 19, 1984 until June 1988, when he referred her to a neurosurgeon. She underwent surgery, performed by Dr. John Jackson on June 10, 1988 to remove the C5-6 and C6-7 inter-vertebral discs and fusion of the disc space at each of those levels.
During the term of Dr. Levy's treatment, Mrs. Goldman was seen and treated conservatively by Dr. William Johnson, a neurosurgeon, between July 1985 and November 1985, with no improvement in her pain.
Mrs. Goldman was involved in a second automobile accident on May 17, 1986 which, it is contended by defendants was the cause of her injury and which necessitated the surgery of June 1988 and caused her subsequent pain and disabilities.
The Court feels that the testimony of plaintiff’s treating physician, Dr. Levy, is most helpful in resolving the question of whether the May 1986 accident or the June 1984 accident was the cause in fact of Mrs. Goldman’s present condition and her pain and disabilities.
Dr. Levy testified that the 1984 accident put Mrs. Goldman’s cervical discs “on a down hill course” and that it was, in his opinion, “the main insult which sent this woman on her downhill course”. His opinion was to the effect that the 1984 accident caused her neck problems. His testimony and office records support his belief that the 1986 accident was of minor significance as to her present state of health.
Dr. Jackson, who performed the surgery, diagnosed a bulge in Mrs. Goldman’s intervertebral disc at the L5-S1 level and some degenerative narrowing of the disc space at the L4-5 level. He speculated that she may need surgery for those problems in the future.

DAMAGES:

Plaintiff sustained back and neck injuries as a result of the automobile accident which forms the basis of this lawsuit. Her injuries caused urological problems, cervical vertigo, depression and she continued to have objective signs of injuries in her lumbar area as late as September 1989. That episode of lumbar pain, which necessitated hospitalization for traction therapy, was preceded by and probably caused by an attempt at bicycling.
Psychological disorders secondary to her anxiety and depression required hospitalization and treatment for one month and continuing therapy in the form of visits to Dr. Mielke every two or three weeks. Dr. Mielke, a psychiatrist, and Judith Linde, a Vocational Rehabilitation Counselor, both testified that Mrs. Goldman was not employable because of her physical limitations and depression.
Mrs. Goldman is a sculptress and has produced works of art which, in the opinion of George Rowan, fine arts professor at the University of New Orleans, *903 was(sic) technically superior and which were described by him as superb. He believes she had the potential to be a successful candidate for graduate studies but for her lack of current art work.
Commercial success in the field of sculpture was not achieved by Mrs. Goldman and she can no longer do the large sculpture projects she did prior to the accident in July 1984. She is qualified to work as a commercial artist and art instruction. The Court feels that plaintiffs future earning potential as a sculptress is too speculative to support an award for loss of future earnings in that field.
She is, however, entitled to an award to compensate her for loss of earning capacity as a result of the automobile accident of July 12, 1984.
The Court feels plaintiff Shirley Goldman is entitled to the following damages:
General Damages $250,000.00
Loss of earning capacity past and future $200,000.00
Past Medical Expenses $ 50,882.48
Future Medical Expenses $ 20,000.00
The intervention of Louisiana Health & Indemnity Company in the amount of $16,477.36 was stipulated and the judgment will reflect that agreement.”
On appeal, defendants raise the following specifications of error:
The trial court erred:
1. in dismissing the City and in not allowing an amendment to cure an exception of no cause of action granted on behalf of the City.
2. in finding Mr. Stubbs at fault where he was neither speeding nor following too closely.
3. in finding defendants liable for medical conditions they did not cause.
4. in awarding $200,000.00 for lost earning capacity.
Turning to defendant’s first specification of error, we note that the issue of amendment is moot. Even if the trial court had allowed such an amendment, the City still would not have been found liable based on the testimony of Officer Anthony Ritter and defendant’s lack of rebuttal thereto.
At the time of the Stubbs-Goldman accident, Officer Anthony Ritter was on the scene engaged in traffic control as a result of an accident prior to the Stubbs-Goldman accident.
Officer Ritter’s testimony indicates that he performed the routine procedures in which he was trained for the purpose of accident control. If the defendant wanted to contest the validity of Officer Ritter’s actions at the time of the accident and his subsequent testimony pertaining thereto, defendant could have introduced training manuals to show, perhaps, that Officer Rit-ter’s actions did not conform with his training or the defendant could have introduced standards promulgated by a nationally recognized traffic safety association or by a federal agency in an attempt to show that Officer Ritter’s training did not conform to national standards or he could have refuted by using an expert witness. The defendant did none of these things. The trial court found Officer Ritter’s testimony credible. Accordingly, this specification of error is without merit.
Defendant’s second specification of error is that the trial court erred in finding Mr. Stubbs at fault when he was neither speeding nor following too closely. Defendant argues that Mr. Stubbs was neither speeding nor following too closely. The trial court, however, did not agree and found Mr. Stubbs 100% at fault. We note that the police report indicates that Mr. Stubbs was given a citation for following too closely.
Defendant argues that Louis Stubbs was not negligent because he would have stopped the truck without mishap except that the plaintiff’s vehicle occupied the last available spot in which one could safely stop. This would have been strongly persuasive testimony if any accident reconstruction expert would have testified thereto. None did. This theory has been raised for the first time on appeal and is not supported by the testimony. Based on Officer Anthony Ritter’s testimony as to the location of the accident on the Pontchartrain Expressway and the accident reconstruction expert’s testimony on required *904 stopping distances, it does not appear that Mr. Stubbs could have safely stopped “but for” the location of plaintiff’s vehicle in front of him.
The trial court did not err in finding Mr. Stubbs at fault. All drivers have a duty to reduce speed and exercise increased caution when their vision is impaired, be it by fog, rain, a curve or a hill. R.S. 32:64. The overpass is a hill obscuring Mr. Stubbs’ vision and he had the duty to exercise caution and slow his speed in anticipation of a potential problem on the other side of the hill. This specification of error is without merit.
Defendant’s third specification of error is that the trial court erred in finding the defendants liable for medical conditions they did not cause. The trial court did not find defendants liable for medical conditions they did not create, but rather found that Mrs. Goldman’s injuries were the result of the July 12, 1984 accident with the defendant.
On the day of the accident, Mrs. Goldman was treated at the East Jefferson Hospital Emergency Room where she was x-rayed, prescribed muscle relaxants and anti-inflammatory medicine and was referred to Dr. Russell Levy for follow-up. She saw Dr. Levy on July 26, August 9, September 6 and 21, October 18, November 15 and December 5 of 1984, March 18, June 13, and July 17 of 1985, May 21 and September 22 of 1986.
At the initial visit Dr. Levy placed Mrs. Goldman on Soma Compound with Codeine for pain and Naprosyn, an anti-inflammatory drug. On July 26 due to side effects, he switched Mrs. Goldman from the Naprosyn to Clinoril and told her to continue decreasing her activity. On August 8, Mrs. Goldman was experiencing numbness in the right hand. Dr. Levy continued the medications with heat, rest, and decreased activity. On September 6, Dr. Levy continued the medication and hot packs and placed Mrs. Goldman on massages and physical therapy 3 times a week, referring her to Chris Monasi of the Pontehartrain Bone & Joint Clinic for physical therapy. Dr. Levy continued the physical therapy but switched her to Dolobid in November. Because Mrs. Goldman was still having problems, in December Dr. Levy suggested a CAT scan and continued her on the medication and physical therapy. In March of 1985, a CAT scan was performed indicating an L4-5 bulge and she was continued on the medication.
Because Mrs. Goldman was not getting any better, in July of 1985 she sought a second opinion from Dr. William Johnston, to whom she was referred by Dr. Zanders, her husband’s physician. She saw Dr. Johnston for the first time in June of 1985. Dr. Johnston prescribed Robaxin and sent Mrs. Goldman to a special exercise class for people with back problems at the YMCA in Metairie. She saw Dr. Johnston for four or five times until Dr. Johnston recommended that she take Elavil, an antidepressant. Mrs. Goldman was offended by his suggestion and told him that her problems were real. The last time she saw Dr. Johnston was November of 1985.
Still attempting to get a second opinion, Mrs. Goldman consulted orthopedist Dr. Gernon Brown. She saw Dr. Brown on January 24, 1986 when 5 views of the cervical spine and 4 views of the lumbar spine were taken and on February 14, 1986 for an office visit.
She saw Dr. Levy in May of 1986, after the second accident. Dr. Levy stated that her neck and low-back problems had never recovered from the first accident and she was still on Dolobid from before the second accident. Dr. Levy ordered x-rays which he stated showed no changes from the March 1985 x-rays. He found no evidence of acute injury from the May 1986 accident. He continued the Dolobid and muscle relaxants and prescribed 750 mg of Robaxin.
On September 22, 1986, Mrs. Goldman continued to suffer with a pattern of waxing and waning neck and low back pains. Dr. Levy scheduled her for an MRI which was performed on September 25 at East Jefferson General Hospital. He saw her again on October 2, when he had the MRI results which indicated a mild compression deformity of the C6, a mild annular bulge at C6-7, a disc bulge at C-7, an annular *905 bulge at L4-L5, a slight indentation of the dural sac, and degenerative changes at the L5-S1. She was continued on the medications.
Dr. Levy saw Mrs. Goldman on May 25, 1987 at which time she continued to suffer neck and low back pain. Her medication was continued.
On July 29, 1987 Dr. Levy told Mrs. Goldman that she needed a myelogram and continued her medication.
On September 2, 1987 Dr. Levy chánged Mrs. Goldman’s prescription from Robaxin, which was not longer working to Soma with codeine and returned her to physical therapy. He again told her that she needed a myelogram.
On January 13, 1988 Mrs. Goldman saw Dr. Levy. Her neck and back had been bothering her more over the past month. He put her back on Dolobid and told her that she needed a myelogram.
She saw Dr. Levy again on May 9, 1988 when he prescribed Motrin. Mrs. Goldman told Dr. Levy that she just could not take the pain any more. Dr. Levy again suggested a myelogram. He spoke to her and her husband again on May 16 and told her that she needed a CAT scan. Mrs. Goldman did get a myelogram on May 23, 1988 and they gave her a CAT scan with the dye. The myelogram indicated prominent bulges at the L4-5 and L5-S1 without evidence of nerve root compression, osteophytic ridging at C6-7 and a large tissue density change on the right at C6-7. At this point Dr. Levy felt Mrs. Goldman needed a neurosurgeon and referred her to Dr. John Schumacher.
Dr. Schumacher and Mrs. Goldman had a personality conflict, so Mrs. Goldman asked Dr. Levy to recommend another neurosurgeon. Dr. Levy referred her to Dr. John Jackson.
Mrs. Goldman saw Dr. Jackson on June 6, June 9-14, July 21, October 6, and December 12 of 1988. She additionally saw him on February 13, April 24, June 26, August 31 and November 2 of 1989 and February 5 of 1990. Dr. Jackson first saw Mrs. Goldman on June 6, 1988. He hospitalized her for approximately one week from June 9 through 14 when he performed a double fusion laminectomy. After the surgery, Mrs. Goldman continued to have neck and back pain. Additionally, she developed new problems including ear ringing, blackouts, loss of equilibrium and falling, and a feeling that something was always in her ears. Because of these symptoms Dr. Jackson referred her to Dr. Ca-nale at Brown Mc-Hardy Clinic, who she saw on December 23, 1988. Dr. Jackson also referred her to Dr. Dulitz, an ENT specialist, for the same symptoms. She saw Dr. Dulitz on October 31, 1988 and underwent audio testing the next day.
Dr. Jackson also referred Mrs. Goldman to Dr. A1 Merlin for urological problems. She saw him on October 6, November 3 and 17, and December 5, 1988.
Mrs. Goldman saw Dr. Leon Weisberg, a neurologist at Tulane Medical Center on May 5, 1989 for the same continuing problems of neck and back pain, ear ringing, blackouts, loss of equilibrium and falling and a feeling that something was in her ears. Dr. Weisberg referred her to Dr. Raoul Rodriguez, an orthopedist and Dr. Abel Coman, a psychiatrist.
Mrs. Goldman first saw Dr. Raoul Rodriguez on September 26, 1989. Dr. Rodriguez hospitalized Mrs. Goldman for one week at Tulane, placing her in traction. Post operative follow-up included continuing medication and physical therapy three days a week thereafter.
Mrs. Goldman first saw Dr. Mielke, a psychiatrist on August 4, 1989 at Tulane Medical Center. Dr. Mielke initially prescribed Norpramin, but Mrs. Goldman developed a rash from it. Dr. Mielke then switched her prescription to Prosacthin, but the Prosacthin proved ineffective so he returned her to Norpramin. Her current medications from Dr. Mielke are Lithium, Librium, Norpramin and Kupaes. On January 26, 1991, Dr. Mielke hospitalized Mrs. Goldman for one month after she suffered acute anxiety and a flashback during a near rear ender accident. She suffered an hysterical reaction as she watched the rear view mirror and saw the truck bearing *906 down upon her. Mrs. Goldman sees Dr. Mielke once a month or bi-weekly, depending on how she is doing. They talk about her physical limitations and how she can cope with them. Dr. Mielke testified that as a result of the first accident, Mrs. Goldman suffers from major depressive disorder. He stated that:
“It is very clear from research that this type of depression begins as a result of major stress. She was classic, right out of the book. She had no prior psychiatric illness or treatment and, then, as a result of the accident and all that followed, she developed this major depression. This was like I say, out of the book.”
In addition he testified that as a result of the accident, she is somewhat phobic about automobiles and has a very low stress tolerance. Dr. Mielke testified that Mrs. Goldman will need a minimum of 5 years future treatment and will most probably need 10 years of treatment.
Defendants called Dr. Robert Ancira to testify. Dr. Ancira is a psychiatrist who examined Mrs. Goldman on October 31, 1990 for one hour. Dr. Ancira testified that in his opinion Mrs. Goldman’s depression was contributed to by two events in her personal life: being diagnosed with cancer and anxiety about her son, daughter-in-law, and grandson. He further felt that she should have taken Elavil in 1984. Apparently, the trial court judge did not find his testimony as credible as Dr. Mielke’s testimony. The foregoing specifications of error are without merit.
Defendant’s last specification of error is that the trial court erred in awarding plaintiff $200,000.00 for lost earning capacity. Initially we would note that contrary to the assertions of defendant, the portfolio introduced at trial consisted of photographs of Mrs. Goldman’s sculptures done prior to the accident, not after the accident as counsel stated. The last sculpture in the portfolio was done in the Fall of 1983 and the accident was in July of 1984. We further note that even to the untrained eye some of Mrs. Goldman’s sculptures were spectacular. In his brief defendant argued that “The trial Judge ruled that he could not award Mrs. Goldman any loss for future earnings as a sculptress because that was too speculative. But then he turned right around and awarded $200,000.00 for loss of earning capacity.” First it should be noted that the $200,000.00 is for both past and future lost earning capacity, not just future. Secondly, the trial court judge did not award Mrs. Goldman lost future earning capacity as a sculptress. Economic expert Seymour S. Goodman testified that Mrs. Goldman’s lost future earning capacity as a sculptress would total $1,249,515.75 ($635,515.75 past + 613,999.57 future). He further testified that her total loss as a commercial artist would be $210,909.97 ($99,640.70 past + 102,269.27 future), as a secondary school art teacher it would total $236,089.91 ($120,786.91 past + 115,303.00 future), and as a college level teacher with a Master’s degree it would total $190,-627.58 ($48,156.92 past + 142,470.66 future). As can be seen, the trial judge was well within the ranges of testimony for occupations other than a sculptress. Defendant’s economic expert Kenneth J. Bou-dreaux testified that “I was not provided any kind of information an economist would need to render an opinion about her”. He testified that her loss of earning capacity totaled $23,600 ($10,000 past and 13,600 future). He testified that he was instructed to assume that her lost wages were $2,000. The $2,000 figure represents the value of a piece of Black and Decker equipment that Mrs. Goldman received as a swap for a sculpture she had previously done. She believed the tool to be valued at $2,000 and reported it on her income taxes. The income tax returns, however, were never offered into evidence by the defense. This specification of error is without merit.
We cannot conclude that the trier of fact either was manifestly erroneous in its factual determinations or abused its discretion in the amount of damages awarded. Canter v. Koehring Co., 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 S.2d 1330 (La.1978); Rosell v. ESCO, 549 So.2d 840 (La.1989).
*907 For the reasons discussed, the judgment of the district court is affirmed.
AFFIRMED.
SCHOTT, C.J., dissents in part.

. The actual tortfeasor, Louis Stubbs, has disappeared. The insurer, however, has answered, prosecuted, and perfected this appeal.