ARMSTRONG, Judge,
concurring in part and dissenting in part:
I agree that the trial court correctly assigned one hundred percent of fault to Kah-rim Singleton and, for the reasons set forth below, join with the majority in affirming that portion of the trial court judgment. I also would affirm that portion of the trial court judgment awarding attorney’s fees to Malcolm Ross’s attorney, Jim Maher III, and would increase that award to encompass work done on appeal by Mr. Maher. Therefore, I dissent from the majority to the extent that they reverse the judgment of the trial court as to the award of attorney’s fees.
These appeals follow a bench trial in three consolidated personal injury actions from an *1328 automotive collision. One of those personal injury actions was settled but, in the wake of that settlement, there remained a number of claims among the defendants which were tried. The other two personal injury actions also were tried. Although, as will be seen, the case has some procedural complexity, there are just two general areas of dispute on appeal.
First, one of the drivers, Kahrim Singleton, and his insurer, Aetna Casualty and Surety Company, appeal the trial court’s finding that the other driver, Malcolm Ross, was not at fault and that Kahrim Singleton was 100% at fault. I agree that the trial court’s allocation of fault, which is a factual finding, was not manifestly erroneous or clearly wrong, so we affirm as to that issue. Kahrim Singleton and Aetna raise two other issues as well but they are moot in view of our affirmance of the trial court’s allocation of fault.
Second, one of the defendants, RTA, appeals the trial court’s determination that Ross was a borrowed servant of RTA, so that RTA, rather than the City of New Orleans, is responsible for Ross’ defense costs. I would affirm the trial court’s determination as to that issue. RTA also appeals the trial court’s determination that an indemnity agreement between the City and RTA is not applicable to the situation in this case. Although my reasons differ somewhat from the trial court’s as to this issue, I agree with the result, so I affirm as to this issue as well. (RTA also raises an issue as to whether it provided omnibus insurance coverage for the RTA car Ross was driving at the time of the accident but, as we affirm the trial court’s determination that Ross was not at fault, this omnibus coverage issue is moot.)

FACTUAL AND PROCEDURAL BACKGROUND

The automobile collision occurred at about 1:25 a.m. on I-10 East. Kahrim Singleton was driving a car owned by his wife, Deadria Singleton, who was a passenger. The engine of the Singleton car died. Kahrim Singleton put the gears in “park” so that the car would not roll.
It is undisputed that the Singleton car was stopped fully in the left lane of the three-lane highway. It also is undisputed that the Singleton vehicle stopped on some portion of an overpass. Kahrim Singleton and Aetna argue that the Singleton car was stopped on the crest (i.e., the top) of the overpass. Ross and the other parties argue that the Singleton car was stopped on the downslope of the overpass (i.e., past the crest). The trial court found that the Singleton car was stopped on the downslope.
After the Singleton car stopped, Kahrim and Deadria Singleton remained in the car talking. After some period of time, Ross’s car, coming from directly behind (i.e., also in the left lane), struck the rear of the stationary Singleton ear. Kahrim Singleton and Aetna argued that the Singleton car was stopped for only about one to one-and-a-half minutes before the collision. The trial court found that the Singleton car was stopped for about five minutes prior to the collision.
Kahrim Singleton and Aetna argue that Kahrim Singleton put on the flashing “hazard lights” of the Singleton car when it stopped. The trial court found that Kahrim Singleton did nothing to warn oncoming traffic that the Singleton car was stopped on the highway.
The trial court also found that Kahrim Singleton could have guided the Singleton vehicle, which was traveling at 55 miles per hour when the engine quit, to a safe shoulder to the right of the highway. Kahrim Singleton and Aetna argue that Kahrim Singleton could not have done so.
Ross, the driver of the car that struck the stopped Singleton vehicle from behind, is a New Orleans police officer. He is assigned to a group of police officers referred to as the Transit Unit. As a member of the Transit Unit, Ross worked exclusively on RTA-related matters. When off-duty, he was on call for RTA-related matters and received compensation from RTA for such standby time. Ross was working on an RTA-related matter at the time of the collision. RTA argues that Ross was not a borrowed servant of RTA and the City argues that Ross was a borrowed *1329 servant of RTA. Both the City and RTA agree that, if Ross was a borrowed servant of RTA, then RTA is responsible for Ross’s defense costs and that, if Ross was not a borrowed servant of RTA, then the City is responsible for Ross’s defense costs. The trial court ruled that Ross was a borrowed servant of RTA.
Deadria Singleton filed a suit for personal injuries she suffered in the collision and named as defendants Ross, RTA, the City, Aetna as the liability insurer of Kahrim Singleton and Aetna as her uninsured/underin-sured motorist insurer. RTA filed claims against Aetna as liability insurer of Kahrim Singleton, the City as the alleged employer of Ross, and the City as the alleged indemnitor of RTA. The City filed claims against RTA as the alleged employer of Ross, Kah-rim Singleton and Aetna as liability insurer of Kahrim Singleton. Aetna filed claims against Ross, RTA as the alleged employer of Ross and the City as the alleged employer of Ross. Kahrim Singleton filed suit against Ross, RTA as the alleged employer of Ross and the City as the alleged employer of Ross. By stipulation, Kahrim Singleton’s claim was limited to loss of consortium. Ross filed suit for his personal injuries against Kahrim Singleton and Aetna as liability insurer of Kah-rim Singleton and also sued RTA and the City for indemnity in the event he was held liable. The City and RTA each refused to defend Ross, who was thus required to employ his own defense attorney, and he sought recovery for defense costs from the City or RTA.
Deadria Singleton settled her claims and was no longer a party by the time of trial. Aetna paid her $58,760 as the liability insurer of Kahrim Singleton and $289,230 as her uninsured/underinsured motorist insurer. Aetna also paid her $6,618.00 for the property damage to her car. It was stipulated by all parties that these amounts paid by Aetna would be the amounts at issue in the claims among the defendants.
The trial court found Kahrim Singleton to be 100% at fault and found Ross to be free from fault. The trial court also held that Ross was a borrowed servant of RTA. Consequently, the trial court entered judgment: (1) dismissing Kahrim Singleton’s claim against RTA, the City and Ross; (2) in favor of Ross and against Kahrim Singleton and Aetna as Kahrim Singleton’s liability insurer for $49,946.36 for Ross’s personal injuries; (3) in favor of Ross’s defense attorney and against RTA for $18,000 attorney’s fees; (4) dismissing RTA’s claim against the City and Aetna; (5) dismissing the City’s claims against RTA, Kahrim Singleton and Aetna; and (6) dismissing Aetna’s claims against the City and RTA.

AETNA’S AND KAHRIM SINGLETON’S APPEAL

First, Aetna and Kahrim Singleton argue that the trial court was manifestly erroneous or clearly wrong in finding that the Singleton car was stopped, and the collision occurred, on the downslope of the overpass. They contend that, instead, the Singleton car was stopped, and the collision occurred, on the crest (the top) of the overpass. The significance of this factual issue is that, if the Singleton car were stopped on the crest, then it would have been possible for Ross to have seen it as he approached the overpass and drove up the upslope. On the other hand, if the Singleton car were stopped on the down-slope, then it would be hidden from Ross’s view as he approached the overpass and until he reached the crest and could see down the downslope — at which point he would be close to the Singleton ear.
Ross testified that the Singleton car was stopped on the downslope and that the collision occurred on the downslope.
Kahrim Singleton testified that the Singleton ear was stopped, and the collision occurred, on the crest of the overpass. The trial court’s Reasons For Judgment specifically criticized Kahrim Singleton’s credibility as to how the collision occurred.
Deadria Singleton, the passenger in the Singleton car, was unable to say where the accident occurred. The investigating officer *1330 who came to the scene of the accident testified that the cars both were located on the downslope when he arrived.
On appeal, we review this factual issue as to exactly where on the overpass the collision occurred under the “manifestly erroneous” or “clearly wrong” standard of review. Rosell v. ESCO, 549 So.2d 840 (La.1989).
This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court’s finding. Id. The reviewing court must review the record in its entirety to determine whether the trial court’s finding was clearly wrong or manifestly erroneous.
Nevertheless, the issue to be resolved by a reviewing court, is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. See generally, Cosse v. Allen-Bradley Co., 601 So.2d 1349, 1351 (La.1992); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder’s, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840 (La. 1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). However, where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable factfinder would not credit the witness’s story, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. Rosell, 549 So.2d at 844—45. Nonetheless, this Court has. emphasized that “the reviewing court must always keep in mind that ‘if the trial court or jury’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.’ ” Housley v. Cerise, 579 So.2d 973 (La.1991) (quoting Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990)).
This court has recognized that “[t]he reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.” Canter v. Koehring Co., 283 So.2d 716 (La.1973). Thus, where two permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Id.
Stobart v. State, Through DOTD, 617 So.2d 880, 882-83 (La.1993).
The evidence was conflicting, there were issues as to credibility, and we certainly cannot say that it was unreasonable for the trial court to find that the Singleton ear was stopped, and the collision occurred, on the downslope.
Kahrim Singleton and Aetna argue that the trial court was clearly wrong or manifestly erroneous in finding that Kahrim Singleton took no precautions to warn oncoming traffic. Specifically, they argue that Kahrim Singleton put on the flashing “hazard lights” on the Singleton car.
Kahrim Singleton and Deadria Singleton testified that Kahrim Singleton put on the flashing “hazard lights” on the Singleton car. The trial court’s Reasons For Judgment specifically criticize their credibility in that regard. In particular, the trial court noted Deadria Singleton’s testimony that the electrical system on the car had died when the car stopped.
Ross testified that the Singleton car had no lights on. The investigating officer’s written report states that Ross said, while still at the scene of the accident, that he had seen flashing lights on the Singleton car. Ross denied having told the investigating officer that and, in fact, said that he had told the *1331 investigating officer that he, Ross, had not seen any flashing lights. The investigating officer testified that he had no recollection of the conversation independent of his written report. He did testify that his report was not actually written until the next day.
Under the standard of appellate review of findings of fact, Rosell v. ESCO, supra; Stobart v. State, Through DOTD, supra, we certainly cannot say that the trial court was “clearly wrong” or “manifestly erroneous” in finding that Kahrim Singleton did nothing to warn oncoming traffic. There was conflicting testimony and then there were questions of credibility, and the trial court’s finding is reasonable.
Kahrim Singleton and Aetna also argue that the trial court was clearly wrong or manifestly erroneous in finding that Kahrim Singleton could have guided the Singleton car to the right shoulder of the highway instead of putting the Singleton car’s gears in “park.” Kahrim Singleton and Aetna argue that the right shoulder of the overpass was only two and a half feet wide and, thus, would not have been a position of safety. Of course, while getting onto the narrow shoulder might not have been safe, it would have been less dangerous than remaining fully in the traffic lane.
More importantly, the trial court found that the Singleton car was on the downslope of the overpass at the time of the collision and that the Singleton ear was going 55 miles per hour when its engine quit (the location on the downslope is discussed above and the speed of the Singleton car is uncontested). Also, there was a safe, wide shoulder on the right of the highway at the bottom of the downslope of the overpass. Thus, the trial court reasoned, Kahrim Singleton could have guided the Singleton car, coasting, down the downslope of the overpass to the safe, wide right shoulder at the bottom. Under the standards of appellate review of findings of fact, Rosell v. ESCO, supra; Stobart v. State, Through DOTD, supra, we cannot say that the trial court’s finding that Kahrim Singleton could have guided his car to a safe shoulder was clearly wrong or manifestly erroneous. The inferences that the trial court drew from the evidence were reasonable.
Kahrim Singleton and Aetna argue that the trial court was clearly wrong or manifestly erroneous in finding that the Singleton car was stopped for five minutes prior to the collision. Kahrim and Deadria Singleton both testified at trial that the Singleton car was stopped for about a minute and a half prior to the collision.
In his deposition, Kahrim Singleton testified that the Singleton car was stopped for three to five minutes prior to the collision. At trial, he attempted to explain his change in testimony. He testified at trial that, since his deposition, he and his attorneys had engaged in an “experiment.” Two people left a room in which he was in, leaving him alone, and then one re-entered after three minutes and the other re-entered after five minutes. Based on this, Kahrim Singleton testified at trial, his three to five minute estimate in his deposition was incorrect.
The trial court’s Reasons For Judgment make clear that the trial judge did not find Kahrim and Deadria Singleton’s trial testimony at all credible as to the length of time that the Singleton car was stopped prior to the collision. This, of course, was the trial court’s prerogative, and we cannot say that the trial court was unreasonable in rejecting Kahrim and Deadria Singleton’s trial testimony and accepting Kahrim Singleton’s deposition testimony instead. See Rosell v. ESCO, supra; Stobart v. State, through DOTD, supra.
Even so, Kahrim Singleton and Aetna argue, it was error for the trial court to find that the Singleton ear had been stopped for five minutes when Kahrim Singleton’s deposition testimony was that the Singleton ear was stopped for three to five minutes. Initially, in light of the trial court’s view of Kahrim Singleton’s testimony, it was not unreasonable for the trial court to select the longest time as to which Kahrim Singleton made any admission. In any ease, we do not think the difference between three and five *1332 minutes would have had any impact on the trial court’s determination of the ultimate issue of fact, the allocation of fault, or would affect our appellate review as to that issue.
Lastly, Kahrim Singleton and Aetna generally challenge the trial court’s allocation of 100% fault to Kahrim Singleton, and no fault to Ross, because Ross was the following driver in a rear-collision ease. They argue that a motorist has a duty to keep a lookout for hazards ahead and that, in a rear-collision case, the following motorist has a burden of exculpating himself or herself from a presumption of negligence. See, e.g., Sonnier v. Reed, 532 So.2d 344 (3rd Cir.1988).
In fact, the trial court, in its Reason For Judgment, recognized that in a rear-collision case, there would usually be at least some comparative fault of the following driver. But the following driver’s burden to exculpate himself or herself from a presumption of negligence does not amount to an absolute rule that, regardless of all other facts, the following driver in a rear-collision case must be at fault in some degree. Thus, in a particular factual situation, a rear-collision may occur despite reasonable care upon the part of the following driver. The trial court concluded that this is such a case. We cannot say that this ultimate factual determination was clearly wrong or manifestly erroneous. See Rosell v. ESCO, supra; State, Through DOTD, supra.
Kahrim Singleton and Aetna point out that, in Goldman v. Mullin, 612 So.2d 901 (La.App. 4th Cir.), writ denied, 614 So.2d 1268 (La.1993) the following driver in a rear-collision case was found 100% at fault when that following driver topped the crest of a raised portion of the Pontchartrain Expressway to find traffic stopped on the other side. However, aside from factual differences between that case and this one, the key distinction is that, in Goldman, this Court affirmed the trial court’s allocation of 100% fault to the following driver. Consequently, Goldman lends little support to Kahrim Singleton and Aetna who seek reversal of the trial court’s factual allocation of fault.

RTA’S APPEAL

RTA appeals the trial court’s determination that Ross was RTA’s borrowed servant. Although Ross was not found to be at fault, so that RTA had no vicarious liability to Kahrim Singleton or Aetna, the issue is relevant to liability for Ross’s cost of defense. Specifically, the briefs of RTA and the City agree that, if Ross is RTA’s borrowed servant, then RTA is liable for Ross’s defense costs and that, if Ross is not RTA’s borrowed servant, then the City is liable for those defense costs. Nine factors are considered when determining whether someone has become a borrowed servant:
1. Who has control over the employee and the work he is performing, beyond mere suggestions of details or cooperation?
2. Whose work is being performed?
3. Was there an agreement, understanding or meeting of the minds between the original and borrowing employer?
4. Did the employee acquiesce in the new work situation?
5. Did the original employer terminate his relationship with the employee?
6. Who furnished the tools and place for performance?
7. Was the new employment over a considerable length of time?
8. Who had the right to discharge the employee?
9. Who had the obligation to pay the employee?
Smith v. Two R. Drilling Co., 606 So.2d 804, 812, 813 (La.App. 4th Cir.1992), writ denied, 607 So.2d 560 (La.1992).
Ross was a member of the Transit Unit and had been for many years. The police office assigned to the Transit Unit work exclusively on RTA matters. When off-duty, they are on call exclusively for RTA needs. Unlike other police officers, they cannot work private, paid details when off duty. However, because of the standby pay, the
*1333 Transit Unit is a financially desirable position for a police officer. Transit Unit officers wear a special transit police patch on their uniforms. The Transit Unit is provided with office space by RTA in an RTA building. RTA furnishes the Transit Unit officers with an RTA radio which receives and transmits only RTA calls and not regular police calls. The RTA furnishes the Transit Unit officers with RTA beepers so they can be alerted for RTA-related matters. RTA furnished Ross with a car to use at all times, even when off-duty (because he is on standby for RTA-related matters when off-duty). When Ross signs on in the morning, he signs on with an RTA dispatcher. The RTA dispatcher would assign Ross various incident scenes and other tasks throughout the day. Transit Unit officers receive part of their pay from the City and part directly from RTA but RTA reimburses the City and so ultimately RTA bears the entire cost of the Transit Unit.
There is a written agreement between the City and the RTA providing for police services (and other services) to be furnished to RTA by the City. That agreement provides that, for purposes of worker’s compensation and unemployment compensation the police officers (and others) affected by the agreement will remain employees of the City. Apparently, this is so that the City will bear the legal obligations of providing worker’s compensation and unemployment compensation coverage. However, as the agreement provides for RTA to reimburse the City for the costs of providing services under the agreement, it appears that the costs of such coverage ultimately would be borne by RTA. With the exception of worker’s compensation and unemployment compensation, the agreement says nothing about whether the employees will remain City employees or become RTA borrowed servants.
Consideration of the nine above-listed Smith factors leads to the conclusion that Ross was a borrowed servant of RTA. Overall, it seems as though RTA, through Ross’s supervisor, who also was a Transit Unit police officer, had control over Ross’s work. As all of Ross’s work was exclusively RTA-related, and he performed no general police duties, it was RTA’s work that was being performed. There was an express, written agreement by which the City provided police services to RTA (at RTA’s ultimate expense). It is evident that, Ross acquiesced in his new work situation as it was financially desirable. The City “terminated” its relationship with Ross in the sense that Ross was not available for general police work after he was assigned to the Transit Unit. The “tools” for Ross’s work (car, radio, beeper, office space) were furnished by RTA. Ross’s employment in the Transit Unit had lasted for many years by the time of the accident. Presumably, only the City had the right to discharge Ross as a police officer although, also presumably, RTA could have asked the City to remove Ross from the Transit Unit. It has been noted that the “right to discharge” factor is not very useful because normally only the original (“general”) employer, and not the new (“special”) employer, will have the right to discharge the employee although normally the new (“special”) employer can ask that the employee be removed from the work. See Callaghan, A Primer On the Patterns of Louisiana Workplace Torts, 55 La.L.Rev. 71, 89 (1994). Ross was paid by both the city and RTA although, as RTA ultimately bore all costs of the Transit Unit, the economic reality appears to be that RTA paid for all of Ross’s renumeration. In sum, I find that the trial court’s determination that Ross was a borrowed servant of RTA was correct.
RTA also argues that, under the written agreement between the City and RTA, under which police services were furnished by the City to RTA, the City is bound to indemnify RTA against RTA’s liability for Ross’s defense costs. The indemnity clause relied upon by RTA states:
The City shall indemnify and hold harmless the RTA, Transit Management of Southeast Louisiana, Inc., and/or National Transit Services, Inc. against any and all claims, demands, suits, judgments of sums of money to any party (including any costs of defense) growing out of, resulting from, or by reason of any negligent act or omis *1334 sion, negligent operation or work of the City, its agents, servants or employees, while engaged upon or in connection with the services required or performed by the City pursuant to this agreement, (emphasis added).
Although the indemnity clause extends to costs of defense, it is premised upon negligence by the City employee involved. In the present case, the trial court found Ross free from any fault, and the majority has affirmed that finding, so the indemnity clause is not applicable. The indemnity clause does not require the City to indemnify RTA for any costs when the City employee involved (in this case, Ross) is not found to be negligent. The result reached by the trial court, that the indemnity clause does not apply in the present case, is correct.
Malcolm Ross filed an Answer To Appeal. In it, he seeks (1) an increase in the amount of the judgment in his favor against RTA for his defense costs due to the need for his attorney to represent him as to this appeal and (2) legal interest on the defense costs awarded him below and on any additional defense costs awarded him on appeal. RTA has not opposed or otherwise addressed these two points in its brief. I would modify the judgment below to increase the judgment in Ross’s favor against RTA by $2,000.00 and (2) to provide for legal interest from the date of judgment below on the $18,000.00 defense costs awarded by the trial court and from the date this decision is rendered on the $2,000.00 additional defense costs I would award.
PLOTKIN, Judge,
concurs with reasons:
I agree with Judge Armstrong and Judge Schott in affirming the trial court judgment finding no liability on the part of Officer Ross. Although, as Judge Landrieu notes, the interstate system involved was undoubtedly constructed with appropriate sight distances, that information is not in the record and thus cannot form the basis for imposing comparative liability on Officer Ross.
Concerning attorney fees, I concur with Judge Landrieu and Judge Schott in holding that RTA is not liable for Officer Ross’ attorney fees. I would note that issue was raised directly by RTA’s appeal. Although the words “attorney fees” do not appear in the assignments of error, RTA’s entire appeal is directed to the reversal of the judgment for attorney fees since that is the only liability cast on RTA, which is sufficient to directly raise the issue.