BAGNERIS, Judge.
Plaintiff/Appellant, Patricia Gracianette (“Ms. Gracianette”), appeals the judgment of the Office of Workers’ Compensation, whereby, the Workers’ Compensation Judge (“WCJ”) found in favor of Defendant/Appellee, Emeril’s Restaurant (“Em-eril’s”) and against Ms. Gracianette. The WCJ ruled that Ms. Gracianette was not entitled to reinstatement and/or continued workers’ compensation indemnity or medical benefits. On this basis, the WCJ dismissed Ms. Gracianette’s claim at her cost. On appeal, Ms. Gracianette argues that the WCJ erred by failing to award her additional Supplemental Earnings Benefits. Ms. Gracianette also argues that the WCJ erred in finding that she is not entitled to any additional medical benefits. For the reasons that follow, we affirm the ruling of the trial court.

FACTS AND PROCEDURAL HISTORY

The relevant facts of this case are not in dispute. Plaintiff/Appellant, Ms. Gracian-ette, was employed as a bartender with Emeril’s Restaurant. On April 3, 1993, while working as a bartender at Emeril’s, Ms. Gracianette sustained injury when she lifted a soft drink canister within the course and scope of her employment. After treatment for her injuries, Ms. Gra-cianette was left with permanent restrictions which she contends kept her from working as a bartender and also limited her to working forty (40) hours per week. Notably, at the time of her injury, Ms. Gracianette was also working as a Real Estate agent with Gertrude Gardner Real Estate Agency (“Gertrude Gardner”). Ms. Gracianette was ultimately able to return to work as a real estate agent with Gertrude Gardner, even with her restrictions. The question at trial was whether Emeril’s owed Ms. Gracianette Supplemental Earnings Benefits based upon her inability to return to her bartending job.
On December 19, 1997, trial was held, and the trial court ruled that Ms. Gracian-ette was not entitled to any additional indemnity benefits or medical benefits. It is from this ruling that Ms. Gracianette now appeals.

DISCUSSION

Standard of Review

Factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551; Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129; Freeman v. Poulan/Weed Eater, 93-1530, (La.1/14/94), 630 So.2d 733. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Banks, supra; Freeman, supra; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Mart v. Hill, 505 So.2d 1120 (La.1987). Where there are two permissible views of the ^evidence, a factfinder’s choice between them can never be manifestly erroneous or clearly wrong. Banks, supra; Stobart, supra. Thus, “if the [factfinder’s] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Banks, supra; Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La.1990).

ASSIGNMENT OF ERROR NUMBER ONE

The trial court erred in failing to award additional Supplemental Earnings Benefits to the Plaintiff/Appellant.

On appeal, Ms. Gracianette contends that the WCJ was clearly wrong in finding *37 that she was not entitled to additional Supplemental Earnings Benefits. At the time of the accident, Ms. Gracianette was working a full-time job as a real estate agent for Gertrude Gardner during the day, and a part-time job as a bartender at Emeril’s on certain evenings. In determining whether or not Ms. Gracianette was entitled to additional Supplemental Earnings Benefits, the WCJ compared Ms. Gracianette’s pre-injury wages as a bartender to her post-injury wages as a real-estate agent and concluded that Ms. Gra-cianette was able to earn 90% of her pre-injury wages as a bartender and, as a result, was not entitled to additional Supplemental Earnings Benefits.
Ms. Gracianette argues that the WCJ erred by comparing her pre-injury wages as a bartender to her post-injury wages as a real-estate agent in order to determine whether or not she was entitled to Supplemental Earnings Benefits. She argues that the WCJ should have only compared her pre-injury wages as a bartender to her post-injury wages as a bartender. We disagree with this argument.

Supplemental Earnings Benefits

The criteria for the payment of Supplemental Earnings Benefits is set forth in LSA-R.S. 23:1221(3). Under the provisions of LSA-R.S. 23:1221(3)(a), an employee is entitled to receive Supplemental Earnings Benefits if he sustains a work-related injury that results in his inability to earn ninety percent (90%) or more of his average pre-injury wage. Initially, the employee bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his inability to earn that amount under the facts and circumstances of the individual case. McCarroll v. Airport Shuttle, Inc., 99-0511 (La.App. 4 Cir. 9/29/99), 743 So.2d 827; Freeman, supra.
Once the employee’s burden is met, the burden then shifts to the employer who, in order to defeat the employee’s claim for Supplemental Earnings Benefits or establish the employee’s earning capacity, must prove, by a preponderance of the evidence, that the employee is physically able to perform a certain job and that the job was available to the employee in his or the employer’s community or reasonable geographic region. The amount of an award of Supplemental Earnings Benefits is based upon the difference between the claimant’s pre-injury average monthly wage and the claimant’s proven post-injury monthly earning capacity. McCarroll, supra; See, Seal v. Gaylord Container Corp., 97-0688 (La.12/2/97), 704 So.2d 1161, LSA-R.S. 23:1221(3)(a).

Analysis

This case presents an interesting set of circumstances because it involves a “moonlighting” employee, Ms. Gracianette, who, at the time of the accident, was working full-time as a real estate agent during the day and part-time as a bartender at night. At trial, Ms. Gracianette testified that prior to the April 3, 1993 accident at Emeril’s, she had been working for three years at Emeril’s. She also testified that for one year prior to the accident, she had simultaneously been working as a real estate agent with Gertrude Gardner. Ms. Gracianette stated that during this year prior to the accident, she would basically work her real estate job during the day for approximately forty (40) hours per week, and she would work her Emeril’s job on certain evenings for approximately thirty (30) hours per week.
On April 3, 1993, soon after the accident, Ms. Gracianette reported the accident to her supervisor at Emeril’s, who instructed her to go to Ochsner Medical Center’s Emergency Room. Ms. Gracianette did so. Ms. Gracianette subsequently chose to be treated by Dr.’s Douglas Swift and Rand Voorhies at Ochsner Hospital. Dr. Robert Mímeles, Emeril’s choice of physician, also treated Ms. Gracianette. Ms. Gracianette continued to work at her full-time job as a real estate agent after the accident. Em-eril’s asserts that Ms. Gracianette worked *38 in a modified capacity as a bartender at Emeril’s until she underwent surgery on August 5,1993. However, Ms. Gracianette testified that she never returned to Emer-il’s in any capacity as a bartender after her accident. Subsequent to her surgery and rehabilitation after surgery, Ms. Gra-cianette returned to work as a real estate agent for Gertrude Gardner. Both sides agree that she did not return to her bar-tending position at Emeril’s after this surgery.
Dr. Swift, one of Ms. Gracianette’s treating physicians, testified in his deposition that Ms. Gracianette reached maximum medical improvement on May 3, 1995. However, Dr. Mímeles, another one of Ms. Gracianette’s treating physicians, testified that Ms. Gracianette reached maximum medical improvement on March 3, 1994.
In an effort to assist Ms. Gracianette in returning to gainful employment in addition to her real estate position, Emeril’s retained the services of J. Fred Crane (“Mr. Crane”), a vocational rehabilitation specialist. Mr. Crane testified by deposition that he identified four alternate additional employment options for Ms. Gra-cianette. Mr. Crane was aware of Ms. Gracianette’s restrictions as a result of the Emeril’s accident at the times that he identified these alternate employment options for Ms. Gracianette.
On October 13, 1994, he identified the following four positions: 1) a cashier position with the Queen of New Orleans River Boat Casino and River City River Boat Casino, earning $7.00 to $8.00 per hour working the 4:00 pm to midnight shift; 2) a bartending position with the Queen of New Orleans and River City Casino, earning $5.50 per hour plus tips; 3) a front desk clerk position at the Fairmont Hotel, earning $6.00 per hour and working the 3:00 pm to 11:00 pm shift; and 4) a car rental agent with Alamo Car Rental Agency, earning $5.00 per hour, plus bonuses and working the 4:30 pm to 12:30 am shift. Dr. Swift approved of all of these positions with the assumption that they allowed for break periods and lunch, as well as alternation between sitting and standing. Dr. Mímeles approved of all of these positions.
Mr. Crane presented these options to Ms. Gracianette. However, Ms. Gracian-ette advised Mr. Crane that she had a moralistic problem with the gaming issue. She further advised Mr. Crane that she did not feel safe working in New Orleans, despite the fact that Emeril’s, where she had worked for three years, is located in the heart of the City of New Orleans. She also advised Mr. Crane that she may apply for the hotel front desk clerk position, but she never did so.
On June 12, 1995, in response to Ms. Gracianette’s issues with the alternate options, Mr. Crane again presented her with alternative employment options. These options were as follows: 1) a cashier position with Courtesy Honda, earning $5.50 per hour and working from 6:00 pm to midnight on two nights per week and 8:00 am to 5:00 pm on alternating Saturdays, but working no more than 18-20 hours per week; 2) a position as a PBX Switchboard Operator with Embassy Suites Hotel, earning $6.00 per hour and working from 3:00 pm to 11:00 pm; 3) a telemarketing position with Louisiana Home Garden Iron Works Co., earning $6.00 per hour, plus commissions and working from 3:00 pm to 8:00 pm on Monday through Thursday and from 9:00 am to 1:00 pm on Saturdays, for a total of 25 hours per week; 4) a mutual clerk position with the Finish Line, earning $6.50 per hour and working the 5:30 pm to 11:00 pm shift five days a week; 5) a position as a telephone answering service with the answer board, earning $4.40 per hour and working the 3:00 pm to 11:00 pm shift on a full-time basis. Dr. Swift approved of the following positions: the cashier position with Courtesy Honda; the telemarketing position with Louisiana Home Garden Iron Works Company; and the mutual clerk position with the Finish Line. Again, Dr. Mímeles approved all of *39 these positions as additional alternate employment for Ms. Gracianette.
Emeril’s noted that Mr. Crane provided a description of the physical requirements of a real estate agent’s job and was very clear that the jobs were being presented for approval by the physician as jobs to be worked by Ms. Gracianette in addition to her job as a real estate agent during the day. Emeril’s further noted that all of the alternate positions identified required Ms. Gracianette to work during the same general time frame, early evening to night, that she did when she was working as both a bartender at Emeril’s and as a real estate agent with Gertrude Gardner prior to her injury.
Ms. Gracianette testified that her‘job as a real estate agent has not been affected at all by the injuries she sustained while in the course and scope of her employment at Emeril’s:
Q.: Have you found since the time of your injury that you have been able to devote more time to real estate business at this time, or is it about the same or less?
A.: It’s about the same.
[[Image here]]
Q.:....But, can you tell us, are you working more now than you were before the accident?
A.: It’s about the same.
* * * *
Q.: Okay. Have there been any time periods since your accident after you recuperated when you have not worked as a real estate agent?
A.: I’m sorry, could you say that again?
Q.: Have there been any time periods since your accident when you have not worked as a real estate agent?
A.: No.
The record reveals that Ms. Gracian-ette’s income tax returns for 1993, 1994, 1995 and 1996 were admitted as exhibits at the trial. The WCJ’s judgment states lothat Ms. Gracianette’s 1993 gross earnings were $20,489.45, $13,326.40 of which was earned post-injury over an eight-month period. In 1994, 1995, and 1996, Ms. Gracianette grossed, as a real estate agent only, $32,587.00, $51,343.00, and $59,982.00, respectively. These figures illustrate that every year after the accident at Emeril’s, Ms. Gracianette earned more by just working in her real estate position than she did when she was working both her bartending and real estate jobs before the accident.
In her Written Reasons for Judgment, the WCJ noted that Ms. Gracianette received, over a three-year period, without any interference by Emeril’s or its insurer, both Temporary Total Disability benefits and Supplemental Earnings Benefits. The WCJ determined that Ms. Gracianette was not entitled to some of these benefits. The WCJ found that Ms. Gracianette actually received an actual Temporary Total Disability overpayment of $19,320.75, as well as a claimed Supplemental Earnings Benefits overpayment of $15,104.18. The WCJ used these overpayments as a basis for determining that Ms. Gracianette was not entitled to continued benefits, indemnity or medical, and to dismiss Ms. Gracian-ette’s claim with prejudice.
In ruling that Ms. Gracianette was not entitled to additional Supplemental Earnings Benefits, pursuant to LSA-R.S. 23:1221(3), the WCJ stated as follows in her written Reasons for Judgment:
Claimant has also failed to prove entitlement to Supplemental Earnings Benefits pursuant to LSA-R.S. 23:1221(3), as her income shows she has been, and continues to be capable of earning, and did earn in most months, at least 90% of her pre-injury wages. She presented no evidence that she was physically unable, due to her injury, to earn less than 90% of her pre-injury wages in the months she earned less than 90% or zero wages. As such, Claimant was not then, and is *40 not now, entitled to Supplemental Earnings Benefits.
* * * *
.... Being unable to work at a second job is not, in and of itself, sufficient to establish entitlement to workers’ compensation benefits, unless it impacts the employee’s earning capacity. In this case it does not. As a full-time real estate agent, Claimant has consistently earned more than she earned as a part-time real estate agent and as a bartender.
Using LSA-R.S. 23:1221(3) as a basis for our analysis, we must determine whether Ms. Gracianette met, by a preponderance of the evidence, her burden of proving that her work-related injury resulted in her inability to earn ninety percent (90%) or more of her pre-injury wage under the facts and circumstance of this particular case. We find that she did not meet this burden.
In the present case, Ms. Gracianette testified at trial that she is making more gross income now than she did prior to the accident. Additionally, her income tax returns clearly show that her income has increased, markedly since the accident. These facts alone appears to be enough to find, as the WCJ did, that Ms. Gracianette was not entitled to Supplemental Earnings Benefits. LSA-R.S. 23:1221(3)(a) clearly states that the only way an employee is entitled to receive Supplemental Earnings Benefits is if, and only if, that employee’s work-related injury does not allow the employee to earn 90% or more of his average pre-injury (Emphasis added) wage. Ms. Gracianette has clearly earned more than 90% of her pre-injury wage since she sustained injuries at Emeril’s.
However, as mentioned previously, Ms. Gracianette argues that the WCJ erred by comparing her pre-injury wages as a bartender to her post-injury wages as a real estate agent in order to conclude that Ms. Gracianette was able to earn 90% of her pre-injury wages and hence, was not entitled to Supplemental Earnings Benefits.
The pivotal issue with regard to this assignment of error is whether the WCJ properly calculated Ms. Graeianette’s pre-injury wages and her post-injury wages when she made the comparison for purposes of determining whether or not Ms. Gracianette was entitled to additional Supplemental Earnings Benefits.
Ms. Gracianette cites Phillips v. United Parcel Service, 28,110 (La.App. 2 Cir. 2/28/96), 669 So.2d 1375 as support for her argument that, in the case of an injured employee with both a full-time and a part-time position, the full-time wages of a claimant should be excluded from the calculation both before and after her injury. Ms. Gracianette’s counsel argues that “any other approach would penalize Plaintiff for an upturn in a business cycle which Plaintiff would have benefited from regardless of her injury and subsequent disability.” For the reasons discussed more fully herein below, we find that Phillips is distinguishable from this case. We also respectfully decline to accept the holding of this Second Circuit case.
In Phillips, the plaintiff was employed by two different employers. He worked at a bank for 40 hours a week at the rate of $6.50 per hour or $260.00 per week. He simultaneously worked at UPS for 17.2 hours per week at $10.10 per hour or $173.82 per week. The plaintiff sustained a disabling injury on his UPS job. The plaintiff continued to work for the bank after is injury, but he ceased working for UPS. UPS paid Temporary Total Disability benefits for about six weeks following the plaintiffs injury, and Supplemental Earnings benefits thereafter, calculated solely on the plaintiffs UPS wages, before terminating the plaintiffs Supplemental Earnings Benefits. Relying on LSA-R.S. 23:1021(10)(a)(iv)(bb) and 23:1221(3), UPS said that it terminated the plaintiffs Supplemental Earnings Benefits because the plaintiff was able to earn, and had earned, wages from the bank that were *41 equal to 90% of his UPS wages. The WCJ agreed with UPS and found in their favor. The plaintiff appealed and the Second Circuit Court of Appeal for the State of Louisiana reversed.
Our honorable brethren at the Second Circuit noted the particular quandary we now find ourselves in when they quoted from Malone & Johnson’s Workers’ Compensation Law and Practice[1] and noted:
Wage calculation issues, historically, have given “difficulty everywhere” because some employees moonlight, holding successive employments or working for joint employers, some work more or less than 40 hours per week, by order or by choice, and some employees are paid piecemeal, while others are paid by the hour, day, week or month.
Using LSA-R.S. 23:1021(10), which defines part-time employment, the Second Circuit determined that subpart (aa) applies to factual situations where an employee, working both a full-time job and a part-time job, sustains injury and a resulting disability in the service of one employer, but not the other. The Second Circuit noted that subpart (aa) does not qualify or limit how the wage basis is to be made to calculate the Supplemental Earnings Benefits mandated by LSA-R.S. 1221(3) for an employee in this particular type of circumstance. Because of this, the Second Circuit reasoned that the calculation for the purpose of Supplemental Earnings Benefits could be made in one of two ways: 1) by making the comparison combining both the wages from the bank job and the UPS job; 2) by making the comparison combining only the part-time UPS wages and excluding the bank wages both before and after the injury. In the Phillips fact situation, unlike in our particular fact situation, the results were the same no matter which formula you used. Further, in either example, the Phillips’ plaintiffs post-accident earnings were less than 90%, unlike the fact situation in our case.
Phillips is further distinguishable from our case because the plaintiff there, when limited to working his bank job only, earned nowhere near the requisite 90% of his pre-injury wages. In our case, however, the plaintiff not only “came close” to 90% of her pre-injury wages, she far exceeded them.
In addition to that fact that Phillips is distinguishable from our case in important ways, there is also the fact that using Phillips in the way that the plaintiff suggests would lead to absurd results. For instance, if Ms. Gracianette had earned $1,000,000.00 from her real estate income alone, Ms. Gracianette would still have us award her Supplemental Earnings Benefits simply because her disability allegedly prevents her from working a second job as a bartender and receiving an income from this part-time job. This would be absurd.
Using Phillips in this way would also fail to serve public policy. Workers’ Compensation is designed to provide an injured claimant with a basis of support. It is not, however, a basis of tort recovery.
For the foregoing reasons, we respectfully decline to accept the holding of the Second Circuit Court of Appeal for the state of Louisiana in Phillips.
However, our analysis under LSA-R.S. 23:1221(3) is still not complete. According to this statute, once the employee meets his burden of proving by a preponderance of the evidence that his injury resulted in his inability to earn 90% or more of his pre-injury wages, the burden then switches to the employer. In order to defeat the employee’s claim for Supplemental Earnings Benefits or establish the employee’s earning capacity, the employer must prove, by a preponderance of the evidence, that the employee is physically able to perform ascertain job and that the job was available to the employee in his or the employer’s community or reasonable geographic region.
*42 Assuming arguendo that we choose to agree with Ms. Gracianette’s argument regarding the wage calculation issue, we still must determine whether Em-eril’s met its burden of proof so as to defeat Ms. Gracianette’s claim. After a thorough review of the record, we find that Emeril’s did indeed meet its burden of proof, thereby defeating Ms. Gracianette’s claim for additional Supplemental Earnings Benefits.
On two separate occasions the vocational rehabilitation expert hired by Emeril’s presented Ms. Gracianette with alternative part-time employment options. The record reveals that on the first occasion, both of Ms. Gracianette’s treating physicians approved of all of these other options. Ms. Gracianette expressed that she had “issues” with working in gaming. Inexplicably, Ms. Gracianette also expressed a problem with working in New Orleans because she did not feel safe. This is odd considering the fact that for three years she did not have a problem with working at Emeril’s, which is located in downtown New Orleans.
In an effort to accommodate Ms. Gra-cianette, Emeril’s later presented Ms. Gra-cianette with other alternative part-time employment options. One of Ms. Gracian-ette’s treating physicians approved of her working in three out of the five options offered. Ms. Gracianette’s other treating physician approved of her working in all of the offered positions. At trial, Ms. Gra-cianette confirmed that she met with the vocational rehabilitation expert, Mr. Crane, after the accident. She also confirmed that Mr. Crane made her aware of other part-time jobs. Ms. Gracianette further testified that despite this, she did not even bother to apply for any of these positions.
The preponderance of the evidence shows that Ms. Gracianette is physically capable of performing other part-time jobs comparable, in timing and wages, to the part-time bartending job that she held pri- or to her accident. The preponderance of the evidence also shows that these jobs were available to Ms. Gracianette in a reasonable geographic region. The fact that Ms. Gracianette chose not to exercise these offered options is a personal choice for which Emeril’s should not be penalized. Based on the foregoing, we find that Em-eril’s met its burden of proof and defeated Ms. Gracianette’s claim for additional Supplemental Earnings Benefits.
At trial, Ms. Gracianette testified that her doctors feel that she can work a full-time job, but they feel that she can no longer work a second job. This is contrary to Emeril’s assertion that Dr. Swift approved of some of the jobs offered by Emeril’s vocational rehabilitation expert as alternate part-time employment options for Ms. Gracianette. This is also contrary to Emeril’s assertion that Dr. Mímeles approved of all of these part-time positions.
Ms. Gracianette also testified that she never went back to work at Emeril’s in any capacity after her accident. Emeril’s asserts otherwise and says that Ms. Gra-cianette returned to work in a modified bartender position until her surgery on August 5,1993.
These opposing assertions by Ms. Gra-cianette and by Emeril’s illustrate that they both disagree as to whether or not Ms. Gracianette was “cleared” to work a part-time job in addition to her real estate job. The WCJ apparently chose to believe Emeril’s on this point. Because the WCJ had an opportunity to view Ms. Gracian-ette’s live testimony and to assess her credibility, we find that the WCJ did not commit manifest error when she chose to believe that Ms. Gracianette was indeed able to work a part-time job that allowed for the restrictions she sustained as a result of her workplace accident.
For the foregoing reasons, we find that the WCJ did not err when it declined to award additional Supplemental Earnings Benefits to Ms. Gracianette.

*43
ASSIGNMENT OF ERROR NUMBER TWO

The trial court erred in finding that the Plaintiff/Appellant was not entitled to any additional medical benefits.

On appeal, Ms. Graeianette argues that the WCJ erred when she found that she was not entitled to any additional medical benefits. Ms. Graeianette argues that Emeril’s presented no evidence to support this finding of the court. She further argues that medical benefits are not tied to indemnity benefits such that disqualification from one necessarily means disqualification from the other.
After a careful review of the record in this case, we find that the WCJ did not err when she ruled that Ms. Graeianette was not entitled to any additional medical benefits.
A court of appeal may not set aside a trial court’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong.” Stobart, supra; Rosell v. ESCO, 549 So.2d 840 (La.1989). This court has announced a two-part test for the reversal of a factfinder’s determinations:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Stobart, supra; See, Mart v. Hill, supra. Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder’s conclusion was a reasonable one. Stobart, supra; See generally, Cosse v. Allen-Bradley Co., 601 So.2d 1349 (La.1992); Housley v. Cerise, 579 So.2d 973 (La.1991); Sistler, supra.
In her Written Reasons for Judgment, the WCJ stated in pertinent part:
Claimant last saw her treating physician, Dr. Swift, in May 1995. There is no evidence that the defendant terminated claimant’s medical treatment as she continued to receive workers’ compensation indemnity benefits for an additional 16 months. The most recent contact she had with any physician, according to the evidence presented, was a visit with the employer’s physician of choice, Dr. Mimeles in May 1996. He was of the opinion that claimant’s current complaints may have been associated with female problems as opposed to the job injury. Neither did claimant testify to any on-going physical problems resulting from her April 1993 injury that prevents her from earning wages, other than she tires after a full day’s work and is therefore unable to work as second job as she did prior to her injury ... (Emphasis added)
The WCJ made specific note of the fact that Emeril’s continued to provide indemnity benefits to Ms. Graeianette for 16 months after her choice of treating physician found, in May of 1995, that she had reached maximum medical improvement. During this 16-month period, Dr. Mimeles, Ms. Gracianette’s other treating physician, in May of 1996, also found that she had reached maximum medical improvement. Despite having been declared as reaching maximum medical improvement by two physicians at this point, Emeril’s provided indemnity benefits for an additional four months. Emeril’s did this despite the fact that Dr. Mimeles, their choice of treating physician, found that Ms. Graeianette’s subjective, and not objective, complaints could have been associated with female problems, rather than her on-the-job injury. This supports our conclusion that the WCJ was reasonable when she found at trial, on June 4, 1998, that Ms. Gracian-ette was not entitled to any additional medical benefits.
This assignment of error is without merit.

*44
CONCLUSION

For the foregoing reasons, the judgment of the Workers’ Compensation Judge is hereby affirmed.

AFFIRMED.

. 14 Louisiana Civil Law Treatise (3d ed. 1994), § 325 atp. 104.